383 F.Supp. 269 (1974)
James C. MILLSTONE, Plaintiff,
v.
O'HANLON REPORTS. INC., Defendant.
No. 72 C 224(3).
United States District Court, E. D. Missouri, E. D.
October 24, 1974.
*270 Richard D. Baron and Stanley E. Goldstein, Elliott, Liberman, Baron, Goldstein & Freund, St. Louis, Mo., for plaintiff.
Lon Hocker, Ziercher, Hocker, Tzinberg, Human & Michenfelder, Clayton, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
This action is before the Court for decision on the merits following the trial to the Court sitting without a jury.
Plaintiff, James C. Millstone (herein Millstone) brought this action alleging violation of 15 U.S.C. § 1681 et seq., commonly known as the "Fair Credit Reporting Act", against the defendant, O'Hanlon Reports, Inc. (herein O'Hanlon). The Court being fully apprised of the premises hereby makes the following findings of fact and conclusions of law.

Findings of Fact
1. This Court has jurisdiction over the subject matter of this suit and the parties hereto pursuant to 15 U.S.C. § 1681p.
2. The plaintiff, James C. Millstone, is an Assistant Managing Editor of the St. Louis Post-Dispatch, a local daily newspaper. He has worked for the Post-Dispatch in various positions since 1958. Prior to his return to the St. Louis area in 1971, he worked in Washington, D. C. as a correspondent for approximately seven years covering various federal agencies, including the White House, and had an FBI clearance to travel with Presidents Johnson and Nixon.
3. The defendant, O'Hanlon Reports, Inc., is a corporation, formerly known as the National Inspection Bureau, Inc., d/b/a O'Hanlon Reports, Inc., operating under the laws of the State of New York and licensed to do business in the State of Missouri as well as most of the States of the Union. It has as its purpose the investigation and collection of information concerning consumers of predominantly real property insurance and automobile insurance.
4. In August of 1971, Millstone and his family moved to St. Louis, Missouri, so that he might take up his duties as news editor for the St. Louis Post-Dispatch. He thereafter contacted his insurance agent, Norman Kastner, and asked Kastner to place auto insurance for him. Kastner placed the policy with Firemen's Fund Insurance Company. The policy took effect on November 15, 1971, and several days later Millstone, in accordance with 15 U.S.C. *271 § 1681d received a notice that a personal investigation would be made in connection with the new policy.
5. On December 20, 1971, Walter McPherson from the Firemen's Fund Insurance Company informed Kastner (and Kastner informed Millstone) that the policy would be cancelled. After assurances from Kastner of Millstone's character and reputation, the insurance company reversed its decision the following day. Millstone voluntarily cancelled the policy.
6. Millstone discovered from McPherson that the cancellation had been brought about because of a consumer credit report which had been made by the defendant, O'Hanlon Reports, Inc.
7. On December 22, 1971, Millstone went to the office of O'Hanlon Reports where he spoke to William O'Connell, the Office Manager. Millstone was told that he was entitled to know what was in his report but that O'Hanlon was entitled to reasonable notice of ten (10) days before giving the information. When Millstone protested, O'Connell call-the New York Home Office of O'Hanlon and allowed Millstone to speak to a Kenneth Mitchell. Mitchell told Millstone that the information would be available as soon as possible but that he could not give disclosure immediately because the Millstone file was en route from St. Louis to New York through the mails. After Millstone left the office, O'Connell then mailed the file to New York.
8. On December 28, 1971, Millstone received the disclosure of the information in its file from O'Connell at the O'Hanlon offices. O'Connell read the disclosure from a single sheet of paper which had been prepared by David Slayback, the Vice President of O'Hanlon. The disclosure sheet stated in part that:
"The file shows that you are very much disliked by your neighbors at that location [Millstone's Washington residence], and were considered to be a `hippy type'. The file indicates that you participated in many demonstrations in Washington, D. C., and that you also housed out-of-town demonstrators during demonstrations. The file indicates that these demonstrators slept on floors, in the basement and wherever else there was room on your property. The file shows that you were strongly suspected of being a drug user by neighbors but they could not positively substantiate these suspicions. You are shown to have had shoulder length hair and a beard on one occasion while living in Washington, D. C. The file indicates that there were rumors in the neighborhood that you had been evicted by neighbors from three previous residences in Washington, D. C. prior to living at the 48th Street, N. W. location."
This disclosure sheet which Millstone was not allowed to examine was the only item that Millstone was informed of by O'Connell.
9. After protesting virtually all the information contained in the disclosure, Millstone asked O'Connell to explain certain facts contained therein. O'Connell told Millstone that he had no further information and could not answer the questions. He told Millstone that his instructions from the Home Office were only to read the disclosure sheet prepared in New York and to take careful note of any dispute from the customer. At no time was Millstone allowed to look at the actual consumer report file maintained by O'Hanlon upon him, nor were any actual portions of that file read to Millstone at any time by Mr. O'Connell.
10. O'Connell once again called New York and allowed Millstone to speak. David Slayback defended the method and propriety of disclosure to Millstone and neither would nor could explain such matters as the basis and meaning of the statement that Millstone was strongly suspected of being a "drug user".
11. Slayback ordered the Manager of his Silver Springs office, the office which had conducted the original investigation of Millstone, to re-investigate the information. Raymond T. Jonas, the *272 Branch Manager, took approximately three days to complete the re-investigation and then sent his report to the New York office. This re-investigation report contained statements that the Millstone children had "torn up" part of a neighbor's garden and that Mrs. Millstone had used terms such as "pig", and "old hag" to a neighbor and his wife and that she was considered by the neighbors to be a "paranoid", and that Mr. Millstone was considered to be a "hippy type" because he allowed peace demonstrators to stay in his house. Mrs. Millstone was also alleged to have stated that she would allow her children to use drugs.
12. On or about January 12, 1972, O'Connell notified Millstone that the re-investigation was completed and at a meeting between the two read to Millstone both the first and second disclosure sheets along with a cover letter written by Mr. Slayback to the Firemen's Fund Insurance Company. The thrust of these documents was to correct the previous allegations that Millstone was a: "drug user", "hippy type" and the statements about the "peace demonstrators staying at the Millstone residence".
13. On or about January 15, 1972, the Federal Trade Commission, which had received a complaint and request for investigation from Millstone, contacted O'Hanlon, and informed Millstone that the investigation had commenced.
14. In a registered letter dated January 20, 1972, David Slayback informed Millstone of further information contained in the defendant's files, including previously undisclosed criticism of the Millstone children and a statement that Millstone was "utterly lacking in reason and judgment". After Millstone disputed this information in a telephone conversation he received a letter dated February 17, 1972, in which Slayback informed Millstone that the disputed points were not in the new report and thus would not be re-investigated.
15. In each conversation and meeting with O'Hanlon's agents, Millstone requested to see his file but was flatly denied access to it. After O'Connell mailed the file to the New York office of the defendant it remained there.
16. At no time prior to the filing of this lawsuit was Millstone informed of certain critical comments about his wife contained in his file. Millstone first learned of such criticism upon receipt of the answers to plaintiff's interrogatories.
17. From the period of time beginning December 20, 1971 and continuing until the end of February, 1972, the evidence adduced at trial shows that Millstone suffered significant amounts of worry, anxiety and concern over the information which was contained in O'Hanlon's file about him and to whom that information was being disseminated. The evidence also shows that his family life was disrupted to the extent of lack of sleep and a general upsetting of the household in work routine.
18. O'Hanlon's procedures for making disclosure to Millstone were in conformity with previously planned procedural processes explained to managers of the defendant's branch offices several months prior to the effective date of the Fair Credit Reporting Act. These procedures were contained in a handbook which each manager received and which was introduced into evidence at the trial as plaintiff's exhibit 13 (herein referred to as Manual). The procedures called for in the Manual state in pertinent part:
The important thing is to NEVER check the files in the presence of the consumer . . . (Manual, § 609-610-611, p. 1.).
Prior to the time of your appointment with the consumer, you will have received the Statement of Disclosure from the Home Office. At the time of your appointment, ANY and ALL information you may have relating to the consumer, such as copies of files, copy of your statement, index cards, etc. are to be in your desk drawer, OUT OF SIGHT, of *273 the consumer. You are not to show anything, or acknowledge that you have anything, other than the Statement of Disclosure.
Actual disclosure will be accomplished by reading the Statement of Disclosure to the consumer. The statement is to be read word for word, at your normal reading speed. It is not to be read slowly enough for anyone to copy down word for word, nor is it to be read so fast that the Consumer will not understand what you are saying. Part or all of the Statement of Disclosure may be re-read if the Consumer indicates that he did not understand what you are telling him. The Consumer and/or the person with him may not have a copy of the Statement, nor may they be allowed to read the Statement, or touch it. (emphasis added by capitalization is that contained in the Manual) (Manual, p. 1-2).
19. The original report on Millstone was prepared by Alexander Mayes, an employee of defendant in defendant's Silver Springs office. Mayes contacted four neighbors of the Millstones on the block where they last lived while residing in Washington, D. C.
20. Of the four persons contacted, one refused to speak to Mayes, two others told him that they knew of trouble in the neighborhood but knew nothing first hand and wished not to become involved. All the data recovered in Mayes' report was gleaned from a discussion with one neighbor identified as one McMillan, now deceased. Mayes gathered the data in a period of less than one-half hour. Mayes worked on a commission basis and received approximately one-third of the fee charged by the defendnat, which amounted approximately to $1.85 in the Millstone investigation.
21. The time spent by defendant's agents on gathering information for automobile insurance reports is anywhere from ten minutes to one-half hour. The data gathered for real estate insurance transactions may take slightly longer.
22. An investigator for O'Hanlon such as Mayes would average 140 to 160 reports every two weeks.
23. O'Hanlon's Manual concerning the maximum possible accuracy required of such a business organization dealing in consumer reports states that O'Hanlon must: "Adopt procedures to assure maximum possible accuracy of our information on consumers. We must continue to report our facts as we see them be they favorable or adverse, but we must make an additional effort to be sure of those facts." Concerning adverse information, the Manual goes on to state: "When adverse information is developed, it should be verified by at least one other source to avoid the reporting of any prejudice or inaccurate information." (Manual, § 607, p. 2). There was no evidence produced which showed any attempt to verify the adverse information in Millstone's file.
24. O'Hanlon continues to maintain the procedures described hereinabove and David Slayback described them as reasonable.
25. Procedures for disclosure have been changed by O'Hanlon since December, 1971; a consumer will now have his file read to him on request after the file has been examined by the Home Office. Defendant continues to reserve the option of not disclosing information about others relevant to the consumer and contained in his file. For example, Slayback testified that if a report contained adverse information of a serious nature about a consumer's wife, the Company would not disclose that information to the consumer. The defendant would only disclose such information to its client.
26. Branch managers of defendant were not prepared by O'Hanlon to conduct disclosures and to answer questions concerning files by the consumers.
27. Concerning the disclosure procedures followed in the instant case, *274 Slayback testified that the first disclosure was incomplete, and the reason therefor was his rush to satisfy Millstone's demand for disclosure; in his letter of January 20, 1972, he informed Millstone that the reason for the exclusion was that he had not received the information from his Silver Springs office at the time that he prepared the first disclosure. He stated that Millstone's "utter lack of reasoning and judgment" could be implied from the contents of the first consumer report.
28. The reason that adverse information about Millstone's wife was contained in the consumer report and not disclosed was not explained in any way.
29. Millstone's character, reputation in the community, working and personal habits, and the character of his reputation and family was dealt with extensively by character witnesses of national and public reputation at the trial. These character witnesses were unstinting in their praise of Mr. Millstone.

Conclusions of Law
These conclusions will be broken into three parts. Counsel for defendant has placed great emphasis in both his pretrial memoranda and his post-trial briefs on the constitutional problems arising out of such a lawsuit concerning infringement of First Amendment freedoms. Accordingly, the constitutional problem will be dealt with first, and the general law provisions relating to 15 U.S.C. § 1681 et seq., along with damages, will be dealt with separately.

I
Defendant bases his claim of constitutional privilege upon the holdings of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and Rosenbloom v. Metro Media, Incorporated, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). The chief argument of O'Hanlon is that a credit report is constitutionally protected by the First Amendment guarantees of freedom of the press because it is a matter of general or public interest. While the 8th Circuit has not ruled upon whether the aegis of the First Amendment extends to activities such as those of O'Hanlon, four other Circuit Courts of Appeals have ruled on the same or similar question. These four Courts of Appeals have been quite uniform at holding that the activities and publication of retail credit reports are not speech which should be protected under the First Amendment.[*] Any prospective chilling of First Amendment freedoms should be looked at quite carefully by any court. In the present case at bar, it is this Court's opinion that the reports concerning Millstone which were published by O'Hanlon fall within the realm of commercial speech which is not normally within the protections of the First Amendment. A recent Supreme Court case, Pittsburgh Press Co. v. Human Rel. Comm'n, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), has distinguished New York Times v. Sullivan, supra, in the area of commercial speech. The Supreme Court required that for commercial speech to come within the ambits of New York Times that that speech: "communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern." 413 U.S. at 385, 93 S.Ct. at 2559. The facts of this case indicate that the credit reports of O'Hanlon concerning Millstone were distributed for commercial purposes and clearly without regard to social concerns or *275 grievances. Thus, it becomes patently obvious that the protections of the First Amendment will not extend to activities such as those of the defendant, and this case is therefore justiciable.

II
The remainder of this action revolves around the questions of whether or not defendant O'Hanlon is liable under Section 1681n and Section 1681o of this aforecited title. Section 1681n allows the recovery of actual damages, costs and reasonable attorneys fees along with punitive damages for willful non-compliance with the Act in question, and Section 1681o allows actual damages along with costs and attorneys fees for negligent non-compliance with this Act. The standard of care imposed by the aforecited statutory sections is that:
Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. § 1681e(b).
It is clear to this Court as the trier of fact that the defendant was in violation of § 1681e(b), in that its procedures of gathering personal information about consumers, such as Millstone, was only from neighbors from the consumer's residence and that these items were not verified. The evidence also shows that defendant's agent Mayes knowingly included false information in the report which defendant compiled concerning Millstone. In his report agent Mayes refers to a poll of four neighbors, with full knowledge that he spoke only to three neighbors. Also, the report repeatedly asserts that all of the sources were in agreement when Mayes in fact received information from only one source, Mr. McMillan. Considering the prior unblemished record of Millstone and the fact that defendant's own operations Manual concerning such derogatory information states:
"When adverse information is developed, it should be verified by at least one other source to avoid the reporting of any prejudicial or inaccurate information", the actions of O'Hanlon's agent Mayes are so wanton as to be certainly a willful non-compliance with the standard of care imposed by the Act. These actions by defendant's agent Mayes are so heinous and reprehensible as to justify the harsh damages imposed by Section 1681n. Defendant's methods of reporting on consumer's credit backgrounds as shown at trial were so slipshod and slovenly as to not even approach the realm of reasonable standards of care as imposed by the statute. Defendant's reporting methods were so wanton as to be clearly willful non-compliance with the Fair Credit Reporting Act in the eyes of this Court.
Independent of the previously discussed willful violation of the statute is the defendant's violation of § 1681g (a)(1) in that it failed to disclose, and continued until pre-trial discovery forced such disclosure, the nature and substance of all the information contained in its files concerning Millstone. To say that O'Hanlon was parsimonious in its disclosures in this case would be an exercise in understatement. Defendant has stated to the Court that its policy remains not to disclose certain information to consumers which O'Hanlon itself deems appropriate. The previously quoted sections of defendant's operation Manual are ample evidence of plaintiff's attitudes and actions concerning this matter. Millstone was forced to return to defendants' offices on several occasions and each time was able to elicit a little more information from the defendant which concerned him. At no time until this lawsuit was joined and discovery was undertaken did O'Hanlon inform Millstone of the entire amount of information concerning him in O'Hanlon's files. Concerning disclosure to consumers, the legislative history of the statutory sections states:
The House offered the amendment to delete the words `the nature and substance *276 of' in section 609(1). The intent was to permit the consumer to examine all the information in this file except for sources of investigative information, while not giving the consumer the right to physically handle his file. The Senate conferees did not agree to this amendment, contending that the existing language already accomplished this result. The conferees of both Houses intend that this important provision be so interpreted. United States Code, Congressional and Administrative News, p. 4415 (91st Congress, Second Session, 1970).
O'Hanlon was made aware of this intent by Regulations of the Federal Trade Commission prior to the effective date of this Act. The actions of O'Hanlon in having the file mailed to its New York office, and instructing its employee in St. Louis to tell Millstone that the file was en route to New York and that he could not tell Millstone what was in it when the file was actually in St. Louis are further indications of the willful non-compliance of defendant with this Act. The whole thrust of defendant O'Hanlon's actions was an attempt to withhold from Millstone the information that was rightfully due him under the law. The evidence in the case at bar as a whole is so overwhelming and persuasive as to leave no other conclusion that O'Hanlon was in willful violation of various previously discussed portions of the Fair Credit Reporting Act and should therefore be subject to the liabilities enumerated in Section 1681n.

III
In regards to damages, the Court further finds that although plaintiff suffered no lost wages nor incurred medical expenses on the account of the injuries therein, he suffered by reason of his mental anguish and had symptons of sleeplessness and nervousness which were amply testified to, and because of the repeated and numerous times in which plaintiff had to contact O'Hanlon, in many cases having to leave his employment for meetings on account of the defendant's actions as stated above, the plaintiff is entitled to actual damages in the amount of $2,500.00.
Considering the willful non-compliance of O'Hanlon with the requirements of the statute, this Court will assess the sum of $25,000 against defendant O'Hanlon as punitive damages in this action. This Court also finds that the sum of $12,500 will be awarded to plaintiff from defendant for attorneys fees, and the Court will further order that defendant pay costs in this matter. In consequence, judgment for the plaintiff as stated above will be entered.
NOTES
[*] Grove v. Dun & Bradstreet, Inc., 438 F.2d 433 (3rd Cir., 1971) cert. den., 404 U.S. 898, 92 S.Ct. 204, 30 L.Ed.2d 175 (1971); Kansas Elec. Supply Co. v. Dun & Bradstreet, Inc., 448 F.2d 647 (10th Cir., 1971), cert. den. 405 U.S. 1026, 92 S.Ct. 1289, 31 L.Ed. 2d 486 (1972); Oberman v. Dun & Bradstreet, Inc., 460 F.2d 1381 (7th Cir., 1972); Hood v. Dun & Bradstreet, Inc., 486 F.2d 25 (5th Cir., 1973), cert. den. 415 U.S. 985, 94 S.Ct. 1580, 39 L.Ed.2d 882 (1974).