James C. MILLSTONE, Appellee,

v.

O'HANLON REPORTS, INC.,
Appellant.

No. 75–1116.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 15, 1975.

Decided Jan. 14, 1976.

Lon Hocker, Clayton, Mo., for appellant.

Stanley E. Goldstein, Clayton, Mo., for appellee.

Before CLARK, Associate Justice,* LAY and ROSS, Circuit Judges.

Mr. Justice CLARK.

This is a damage action filed by James C. Millstone, appellee, alleging violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681[1] et seq., by O'Hanlon Reports, Inc., in the furnishing of a consumer credit report on Millstone to the Firemen's Fund Insurance Company. Millstone had applied to Firemen's Fund for insurance covering his Volkswagen bus. The policy was issued in due course, but a consumer credit report was ordered from O'Hanlon by the insurance company. The report was furnished to Firemen's Fund approximately a month later.

Among other things, the report related that Millstone, while living in Washington, D. C., his former residence, was a hippie-type person, with shoulder length hair and with a beard on one occasion, who participated in many demonstrations in the Capital, carried demonstrators in his bus back and forth to his home, where he housed them in his basement and wherever else there was room. It reported that he was strongly suspected of being a drug user, that he was rumored by neighbors to have been evicted from three previous residences in Washington, D.C., and that he was very much disliked by his neighbors there. Upon receiving the report, Firemen's Fund directed the agent handling the

sale of the insurance to cancel the policy and secure its return. The agent advised Firemen's Fund that Millstone was a highly respected Assistant Managing Editor of the St. Louis Post-Dispatch. For a number of years, Millstone was at the Post-Dispatch's Washington office, where he often covered the White House and Presidents Johnson and Nixon. Upon learning these facts, Firemen's Fund withdrew its cancellation order and continued the policy in effect.

Millstone, however, was disturbed over the report and demanded that O'Hanlon furnish him a copy. O'Hanlon refused, but it did, about a week later, disclose orally to Millstone what it represented as a synopsis of the report. Upon Millstone's categorical denial of all of the allegations in this disclosure, O'Hanlon ordered a recheck of its sources and found no substance to the allegations contained in the original disclosure. Still, O'Hanlon persisted in its refusal to furnish a copy to Millstone and, indeed, failed to disclose to him all of the contents of the report. This suit was then filed, after which discovery procedures uncovered additional derogatory information contained in O'Hanlon's file and still not reported to Millstone. On trial, the District Judge entered a judgment against O'Hanlon for $2,500 actual and $25,000 punitive damages plus $12,500 attorneys fees.

O'Hanlon raises three questions on appeal: (1) the constitutionality of the Act under the First Amendment; (2) the conclusion of the District Court that the facts found constituted a violation of the accuracy and disclosure sections of the Act; and (3) the recovery of any damages under the proof and, in any event, their excessiveness. We find no merit in any of the points and affirm the judgment.

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

1. Public Law 91–508, Title VI, 15 U.S.C. § 1681 et seq., enacted October 26, 1970, 84 Stat. 1134, as an amendment to the Consumer Credit Protection Act, Public Law 90–321, 15 U.S.C. § 1601 et seq., enacted May 29, 1968. 82 Stat. 146.

### 1. Proceedings in the District Court

The trial court filed a memorandum decision in which it entered detailed and comprehensive findings which are not challenged here.[2] We, therefore, see no point in burdening this opinion with the morbid details of this bizarre affair. For those interested in more factual details, reference is made to the decision of the trial judge at 383 F.Supp. 269 (1974).

### 2. The Constitutionality of the Act

 We limit our review of O'Hanlon's constitutional claim to those provisions of the Act upon which Millstone obtained relief.[3] As we see it, a determination that consumer credit reports are protected speech is critical to O'Hanlon's defense.

The court below ruled on O'Hanlon's broad claim of constitutional privilege with respect to the consumer credit reports by deciding that the Millstone reports were "commercial speech" and thus outside of the protections of the First Amendment. 383 F.Supp. 269, 274 (E.D. Mo.1974). In so holding, the District Court considered only whether the O'Hanlon reports concerning Millstone were protected speech. Because the reports "were distributed for commercial purposes and clearly without regard to social concerns or grievances," *id.* at 275, the court decided that the protections of the First Amendment did not extend to the activities of O'Hanlon.

The "commercial speech" doctrine, first enunciated in *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), has been anything but a settled area of constitutional law.[4] The trial judge based his ruling on *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). There the Supreme Court upheld an order directing a newspaper to cease publishing help-wanted advertisements under sex-based headings. The illegality of the underlying commercial activity militated against affording the advertisement the First Amendment protection that an otherwise legal commercial proposal might receive.

 It is clear that a publication sold for profit is not by that fact alone considered unprotected "commercial speech." *Ginzburg v. United States*, 383 U.S. 463, 474, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966). Nor is the fact that it is an advertisement or some other commercial appeal determinative. *New York Times Co. v. Sullivan*, 376 U.S. 254, 266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In its most recent explication of the commercial speech doctrine, the Supreme Court has indicated that commercial speech remains in a class by itself, entitled to some First Amendment protection but

---

**2.** While some of O'Hanlon's arguments twist conclusions from the findings more to its liking, the interpretation is based upon undisputed factual findings.

**3.** O'Hanlon levels its attack on the Act against §§ 1681b, c and d, that concern the form and content of credit reports and the method of disclosure. It then subsumes that if any or all of these sections are unconstitutional, then the whole Act, including §§ 1681e, g, n and o, must fall because the Act is an unseverable whole. This reasoning overlooks the fact that the Congress provided the necessary severability clause in its original enactment of the Consumer Credit Protection Act, 15 U.S.C. § 1601 *et seq.*, of which the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, is a subchapter and necessarily is encompassed by that severability provision. The Millstone claim is under § 1681e(b) requiring O'Hanlon to "follow rea-

sonable procedures to assure maximum possible accuracy . . . ." Furthermore, the disclosure provision, § 1681g, upon which Millstone also bases some of his claims, stands separate and apart from whatever constitutional infirmities the rest of the Act allegedly suffers. It seems elementary that Congress may compel consumer credit reporting agencies to disclose their findings to the subjects of their inquiry.

**4.** The Supreme Court will be considering some of these issues again in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, No. 74–895, argued this October 1975 Term. In that case, a three-judge district court in the Eastern District of Virginia held that a statute barring pharmacists from publishing or advertising prescription drug prices deprives consumers of their "right to know" in violation of the First Amendment.

treated differently from other types of communication. *Bigelow v. Virginia,* 421 U.S. 809, 825–27, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). *Bigelow* involved the conviction of a newspaper editor for printing an advertisement for a New York abortion referral service. The Supreme Court struck down the Virginia statute in issue and reversed the conviction. In announcing the standard for review in the case, the Court stated:

Advertising, like all public expression, may be subject to reasonable regulation that serves a legitimate public interest. See *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, supra*; *Lehman v. City of Shaker Heights,* 418 U.S. 298 [94 S.Ct. 2714, 41 L.Ed.2d 770] (1974). To the extent that commercial activity is subject to regulation, the relationship of speech to that activity may be one factor, among others, to be considered in weighing the First Amendment interest against the governmental interest alleged. *Id.* 421 U.S. at 826, 95 S.Ct. at 2234. (Footnote omitted.)

The Court went on to note that the State of Virginia's asserted interests were "entitled to little, if any, weight under the circumstances." *Id.* 421 U.S. at 828, 95 S.Ct. at 2235. One of the factors considered was the statute's impingement on the obvious right of Virginia residents to travel to another state to receive medical services legal in that state. *Id.* 421 U.S. at 824–25, 95 S.Ct. at 2234. In other words, the Court recognized the overlay between the First Amendment protection asserted for the advertisement in the case by the editor and the right to travel.

In the instant case, a similar overlay exists but with the opposite result. For here, the challenged statute supports and protects a significant personal right, the right to privacy. See *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). In fact, this interest is one that the Court considered in *Bigelow* and it found the statute lacking: "There was no possibility that appellant's activity would invade the privacy of other citizens, *Breard v. Alexandria* [341 U.S. 622 (71 S.Ct. 920, 95 L.Ed. 1233) (1951)], or infringe on other rights." *Bigelow v. Virginia,* 421 U.S. 809, 828, 95 S.Ct. 2222, 2236, 44 L.Ed.2d 600 (1975). Unlike the Virginia legislature's purpose in enacting the statute in *Bigelow,* the Congress has enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.,* because it found that:

There is a need to insure that consumer [credit] reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(4).

Whether the Congress's asserted purpose be labelled a "compelling interest" or one that simply outweighs the alleged impingement on freedom of press, it is our view that by the test enunciated in *Bigelow,* consumer credit reports are not protected speech for which under the First Amendment "Congress shall make no law . . . ." We agree with the District Court that O'Hanlon's reports are "commercial speech."

Accordingly, Congress's authority to legislate that O'Hanlon "follow reasonable procedures to assure maximum possible accuracy," § 1681e(b), and "clearly and accurately disclose to the consumer" the information in its files, § 1681g, was proper. Likewise, Congress had authority to fix liability, including punitive damages and attorney fees, for willful violations of those requirements. O'Hanlon's challenge to the constitutionality of the Act is, we submit, without merit.

### 3. O'Hanlon's Violations of the Act

The next contention is that O'Hanlon did not violate the accuracy or disclosure provisions of the Act, §§ 1681e(b) and g, and that even if it did, Millstone was not damaged. Given the detailed account of the facts found in the record, we believe this contention merits a short answer.

To us it seems amazing that O'Hanlon makes the claim that its agent

followed reasonable procedures promulgated by it to attain the maximum possible accuracy. Everything in the record is to the contrary. It shows that O'Hanlon's agent devoted at most 30 minutes in preparing his report. His report was rife with innuendo, misstatement, and slander.[5] Indeed, the recheck of his investigation shows that he depended solely on one biased informant; made no verification of the same despite O'Hanlon's requirement that there must be verification; and, finally, it took three days to recheck the original investigation, and every allegation therein was found untrue.

■ O'Hanlon further asserts that its disclosures to Millstone completely revealed the "nature" and "substance" of the derogatory matters in its report. Again, the record proves otherwise. O'Hanlon sought at every step to block Millstone in his attempt to secure the rights given to him by the Act. Not only did O'Hanlon delay and mislead Millstone on the occasion of his first request, but it even did so on a second and third occasion. Not until Millstone brought pressure to bear, through the Federal Trade Commission, and, ultimately, through this lawsuit, did O'Hanlon make the disclosure required by § 1681g.

## 4. Damages

Finally, O'Hanlon claims that its misconduct did not damage Millstone to the extent he recovered. O'Hanlon's argument highlights the following facts: (1) the incorrect report was made for a mere $68 insurance policy; (2) Millstone himself caused further publication of the incorrect report in news stories about his problems with O'Hanlon; (3) Firemen's Fund did not believe the report when confronted with the truth by Millstone's insurance agent; (4) Millstone was not charged for lost employment time by the Post-Dispatch; and (5) Millstone suffered only loss of sleep, nervousness, frustration and mental anguish over the report. Such injury, it says, does not warrant the award of $2,500 in actual damages, or the award of punitive damages.

■ The fact that the Post-Dispatch did not diminish Millstone's pay for the considerable time spent fighting O'Hanlon's grossly inaccurate reports should not inure to O'Hanlon's benefit. Any windfall from his employer's generosity and O'Hanlon's payment of damages properly should go to Millstone. *Cf. Olivas v. United States*, 506 F.2d 1158, 1163–64 (9th Cir. 1974), and *Adams v. Turner*, 238 F.Supp. 643, 644–45 (D.D.C.1965). But O'Hanlon cites the much maligned rule that there should be no recovery in tort for mere mental pain and anxiety, and directs our attention to *Southern Express Company v. John Byers*, 240 U.S. 612, 36 S.Ct. 410, 60 L.Ed. 825 (1916). Here, however, the rule is inapplicable because, unlike

---

5. The company's report containing all of the allegations of bad character, read as follows:

*Comment.* A poll of four of local neighbors at the former address proved that the assureds were very much dislike [sic] here by all informants, mainly because of the attitute [sic] and by the non-discipline of their four children. Mrs. Millstone would allow her children to run free in the area, and they frequently played ball in neighbor's yards, and even gardens, and tore them up on several occasions. When confronted with this Mrs. Millstone was quoted to have said "they will play ball where they please and no one will stop them." In addition, both assureds were reported to be the "hippie" type by all neighbors and participated in many demonstrations here in Washington and also housed out of town demonstrators in their house during these demonstrations, and these demonstrators slept on the floors, in the basement and any where [sic] else they could on assured's property. Assureds were strongly suspected to be drug users by all neighbors, however this could not be positively substantiated by any of our informants. Assured is reported to have shoulder length hair and a beard on one occasion while living here. The risk, a late VW Bus, was used to transport out of town demonstrators to and from the demonstrations here in Washington informats [sic] also stated. Rumors thru [sic] this neighborhood was [sic] that the assureds had lived in three other places in Washinvgton [sic] and were evicted by neighbors from each prior to coming here. Assureds were alos [sic] criticized [sic] in their utter lack of reasoning and judgement by all informants in this neighborhood.

*Southern Express*, Millstone has an independent cause of action under the Fair Credit Reporting Act quite apart from any recovery he might have sought in tort. O'Hanlon analogizes its position to the Federal Rule of Damages for Fraud utilized in cases based upon violations of the Securities Exchange Act, 15 U.S.C. § 78a *et seq.* That rule limits award for mental anquish to actual out-of-pocket losses. It is, however, inapposite to this case, for the statute here specifically calls for punitive damages.

There can be no doubt that O'Hanlon willfully violated both the spirit and the letter of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, by trampling recklessly upon Millstone's rights thereunder. We therefore find no abuse of discretion or other error in the award.

Affirmed.