103 F.Supp.2d 1135 (2000)
Mickey BRUCE, Plaintiff,
v.
FIRST U.S.A. BANK, NATIONAL ASSOCIATION, et al., Defendants.
No. 4:99CV26 CDP.
United States District Court, E.D. Missouri, Eastern Division.
June 20, 2000.
*1136 *1137 *1138 Blair K. Drazic, Vatterott and Shaffar, Maryland Heights, MO, John S. Steward, John S. Steward Law Offices, St. Louis, MO, for Mickey Bruce.
John E. Toma, Jr., John P. Lavey, Newman and Freyman, Clayton, MO, for First U.S.A. Bank, National Association.
G. Carroll Stribling, Jr., Ziercher and Hocker, Clayton, MO, Lewis P. Perling, Kilpatrick Stockton LLP, Atlanta, GA, for Equifax Credit Information Services, Inc.
Daniel V. Conlisk, Dankenbring and Greiman, Clayton, MO, for C.S.C. Credit Services, Inc.
Daniel T. Rabbitt, Rabbitt and Pitzer, St. Louis, MO, Kristine Voelker, Jones and Day, Chicago, IL, for Experian Information Solutions, Inc.
Richard R. Veit, General Partner, St. Charles, MO, for Paula D. Bruce.

MEMORANDUM AND ORDER
PERRY, District Judge.
Plaintiff Mickey Bruce claims that defendant First U.S.A. Bank violated the Fair Credit Reporting Act when it failed to conduct an appropriate investigation into his claim that his former wife had fraudulently *1139 opened two credit card accounts in his name, and when it reported those accounts as delinquent despite his claims of fraud. He also seeks to recover for defamation and tortious interference with his credit expectancy.
I will deny First U.S.A.'s summary judgment motion as to plaintiff's claims under the FCRA and for tortious interference, as I believe that genuine issues of material fact remain in dispute with respect to these claims. I agree with First U.S.A., however, that plaintiff's defamation claim is preempted by the FCRA, and summary judgment will be granted with respect to that claim.

I. Factual Background

First U.S.A. is a national bank that issues credit cards to consumers and makes reports to various credit reporting agencies regarding those credit accounts. Mickey Bruce claims that First U.S.A. inaccurately reported to several credit reporting agencies that he had delinquent credit card accounts and that the credit reporting agencies, in turn, reported the inaccurate information to several lending sources, causing him to be denied credit opportunities with those lenders.[1] Mickey Bruce claims that the accounts had been fraudulently opened in his name by his former wife, Paula Bruce.
First U.S.A. opened the disputed accounts based on credit card applications completed on July 17, 1994, and October 10, 1994. The accounts were opened in the name of plaintiff and his then wife Paula Bruce. The applications listed Mickey Bruce as the cardholder and Paula Bruce as an authorized user. Statements for both accounts were mailed to plaintiff at the home he shared with Paula Bruce at 241 Cresent Avenue, Valley Park, Missouri. Plaintiff claims, however, that he had no knowledge of the existence of the credit cards until April of 1996, when he learned of them when he and Paula Bruce submitted a joint loan application to refinance their home. Mickey Bruce moved out of the marital home on July 10, 1996, and his divorce from Paula Bruce was final on November 26, 1996. On July 29, 1996, he sent written notification to First U.S.A., alleging that the credit cards had been fraudulently obtained in his name. He also sent several subsequent letters to First U.S.A., denying responsibility for the First U.S.A. credit cards and claiming that Paula Bruce had fraudulently obtained the cards in his name by forging his signature.
At some point after receiving plaintiff's letters, First U.S.A. conducted an investigation of plaintiff's allegations. First U.S.A.'s investigation consisted of a "standard procedure," whereby it reviewed the history of the accounts, including payment history, unusual activity on the accounts, previous disputes, review of the credit card applications and a comparison of signatures. The investigation revealed that statements for both accounts had been sent to plaintiff's address and in his name for two years, payments had been timely made during that period, there were no "non-customary" charges on the accounts, and when the first of the two accounts was opened there was a balance transfer of $2,233.49 from a Commerce Bank credit card that plaintiff held jointly with Paula Bruce.
First U.S.A.'s investigation erroneously revealed that there were no previous disputes regarding charges on the accounts. The record indicates that Paula Bruce had disputed a charge for $127.50 in March of 1995. More significantly, the investigation also revealed that the signatures on the credit card applications did not match plaintiff's signature on his driver's license. Nevertheless, based on its investigation, First U.S.A. concluded that no fraud had been committed and that plaintiff was responsible for the accounts. No one from First U.S.A.'s investigation unit spoke with plaintiff or Paula Bruce about the accounts.
*1140 Although some portions of plaintiff's deposition testimony seem to conflict with other portions of his deposition regarding whether he had knowledge of the Commerce Bank balance transfer, in an affidavit[2] submitted in opposition to First U.S.A.'s motion for summary judgment, plaintiff attests that he did not make and was not aware of any balance transfer from his Commerce Bank credit card onto a First U.S.A. credit card, that Paula Bruce was likely responsible for the transfer, that he has never made a purchase with a First U.S.A. credit card and has never made a payment toward any balance on a First U.S.A. card. Paula Bruce testified at her deposition that she did not commit fraud or forgery to obtain the First U.S.A. credit cards, plaintiff was aware of the cards, and that if she signed the applications, plaintiff authorized her to do so.
On August 9, 1996, Crestar Bank denied plaintiff's application for a Visa Gold credit card. Crestar denied the application because plaintiff had sufficient lines of credit with Crestar and because his balances on his revolving credit accounts were too high. Similarly, on September 3, 1996, MBNA America Bank denied plaintiff's application for an NFL Gold Visa credit card because he had sufficient balances on his existing revolving accounts and because he had sufficient credit considering his income. Both Crestar and MBNA relied on credit reports from TRW Consumer Credit Services. Although the record is unclear as to when First U.S.A. first reported the two accounts as delinquent, plaintiff admits that they were not being reported as delinquent in August and September of 1996, although he contends they were being reported as having high account balances at that time.
Starting in 1998, plaintiff was denied credit opportunities because of the delinquent First U.S.A. accounts. On January 14, 1998, plaintiff and his current wife Frances Bruce jointly applied for a loan through Credit Resources, Inc., in the amount of $61,000.00 to refinance and make improvements on a home that Frances Bruce owned individually and had purchased before her marriage to plaintiff. On the application, plaintiff was listed as the borrower and Frances Bruce as the coborrower. Credit Resources denied the loan application based on plaintiff's unsatisfactory credit rating from First U.S.A., as reported by Trans Union Credit Services. Thereafter, on January 22, 1998, Frances Bruce applied for the same loan individually and her application was approved with a 6.875% interest rate.
On April 11, 1998, plaintiff applied for and obtained a loan for the purchase of a recreational vehicle in the amount of $15,512.00, to be repaid over a twelve year period. The record is unclear as to the identity of the lending source for this loan. Plaintiff's interest rate on this loan was 9.59%, even though the prevailing interest rate at that time for a recreational vehicle loan was 6.9%. On April 16, 1998, Bank of the West denied what appears to be a separate application by plaintiff for a loan to purchase a recreational vehicle. Bank of the West denied plaintiff's application because, as reported by Equifax, plaintiff had delinquent credit obligations.
After being rejected by Bank of the West, sometime in April of 1998, plaintiff contacted CSC Credit Services, Inc. to dispute the First U.S.A. accounts. CSC is an affiliate of Equifax and maintains and services consumer credit files for it based on the geographical region. When a consumer in Missouri disputes an item on an Equifax or CSC credit report, CSC is responsible for performing the necessary investigations, updates or revisions. CSC claims that the April 1998 communication was the first time that plaintiff contacted it to dispute the First U.S.A. accounts. Plaintiff testified at his deposition that he *1141 did not recall whether April of 1998 was the first time he contacted CSC or Equifax regarding the First U.S.A. accounts. On April 29, 1998, CSC sent plaintiff a copy of his CSC credit report and a "Research Request" form on which he could list any disputes regarding the report. Plaintiff returned the form on May 7, 1998, disputing the First U.S.A. accounts as "forged/fraudulent." As part of its investigation, CSC sent a consumer dispute verification (CDV) to First U.S.A., indicating that plaintiff disputed the validity of the two First U.S.A. accounts. First U.S.A. verified that the information on the accounts was correct and that the cards belonged to plaintiff. Thereafter, CSC concluded that no fraud existed and sent plaintiff an amended copy of his credit report, still reflecting the delinquent accounts with First U.S.A. On October 1, 1998, plaintiff wrote letters to CSC and Equifax, disclaiming any responsibility for the First U.S.A. accounts. This time, Equifax forwarded a CDV form to First U.S.A. First U.S.A. returned the form to CSC, again verifying that the accounts were accurately reported.
On November 23, 1998, plaintiff and Frances Bruce applied for another loan, this time through Elizabeth Fay Mortgage in the amount of $65,000.00 to again refinance their home at a lower interest rate of 6.75%. On December 3, 1998, Elizabeth Fay denied the loan application because of the unsatisfied collection accounts with First U.S.A. Elizabeth Fay relied on a credit report from Factual Data.
In addition to loss credit opportunities, plaintiff claims that he suffered emotional distress as a result of First U.S.A.'s actions. On July 15, 1996, plaintiff was treated at Barnes-Jewish Hospital for chest pain, which was diagnosed as atrial fibrillation caused by stress. On August 2, 1996, plaintiff visited his family physician, Dr. Donald Walkenhorst, complaining of stress and anxiety caused by his impending divorce and financial debt. Following this visit, Dr. Walkenhorst placed plaintiff on Xanax, an anti-anxiety medication. On August 12, 1996, plaintiff was treated at Deaconess Hospital by Dr. Martin Schwarze, again for atrial fibrillation caused by stress. During this visit, plaintiff complained of anxiety and depression connected with his divorce. Although the First U.S.A. accounts were listed on plaintiff's credit report in July and August of 1996, they were not being reported as delinquent during that time.

II. Discussion

In his second amended complaint, plaintiff claims that First U.S.A. negligently and willfully violated the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq., when it failed to conduct a proper investigation of his disputes regarding two First U.S.A. credit card accounts that it reported to various credit reporting agencies as delinquent.[3] He also alleges that by continuing to report the allegedly inaccurate information to the credit reporting agencies, who in turn reported the information to several lending sources, First U.S.A. defamed him and tortiously interfered with his credit expectancy. He claims that as a result of First U.S.A.'s actions, he suffered emotional distress, loss of credit opportunities, and was inconvenienced.
First U.S.A. moves for summary judgment, arguing that no genuine issues of material fact exist as to whether it conducted a sufficient investigation of plaintiff's disputes, that plaintiff's defamation claim is preempted by the FCRA, that plaintiff has failed to establish the justification element of his tortious interference claim, that plaintiff has failed to establish any cognizable economical or emotional *1142 damages, and that plaintiff is estopped from pursuing this action because he received a benefit from the two First U.S.A. accounts.
Summary judgment is appropriate when the moving party establishes that there are no genuine issues of material fact that bar judgment as a matter of law. Fed. R.Civ.P. 56(c). Genuine issues of material fact exist where a rational trier of fact could find for the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In determining whether summary judgment should issue, the Court views the facts and inferences from the facts in the light most favorable to the nonmoving party. Id. The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). If the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant is unable to make a showing sufficient to establish the existence of an element essential to its case. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).
As a preliminary matter, First U.S.A. moves to strike plaintiff's affidavit and the affidavits of Phillip Adams and Elizabeth Fay, submitted by plaintiff in opposition to the motion for summary judgment. After due consideration, the motion to strike affidavits will be denied. I have not relied on the affidavits of Adams or Fay in reaching the decision here. As to plaintiff's affidavit, his deposition testimony is less than clear, and in the absence of clear deposition testimony, I do not believe that plaintiff's affidavit attempts to create sham issues of fact. First U.S.A.'s motion to strike will be denied.

A. Fair Credit Reporting Act
Under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq., if a consumer notifies a consumer reporting agency of a dispute regarding the completeness or accuracy of information contained in the consumer's credit report, the agency is required to reinvestigate the disputed information. 15 U.S.C. § 1681i(a). As part of its reinvestigation, the agency must notify the furnisher of the credit information of the dispute. 15 U.S.C. § 1681i(a)(2). Upon notice of a dispute from a credit reporting agency, § 1681s-2(b)(1) of the FCRA requires the furnisher of the information to conduct an investigation regarding the dispute and to report its findings accordingly:
After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall -
(A) conduct an investigation with respect to disputed information;
(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2);
(C) report the results of the investigation to the consumer reporting agency; and
(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information....
15 U.S.C. § 1681s-2(b)(1).
Section 1681o of the FCRA provides consumers with a cause of action for negligent noncompliance with § 1681s-2(b), *1143 permitting the recovery of actual damages, costs and attorney's fees. Campbell v. Baldwin, 90 F.Supp.2d 754, 756 (E.D.Tex.2000)(consumers have private causes of action against furnishers of credit information who violate § 1681s-2(b)). But see Carney v. Experian Information Solutions, Inc., 57 F.Supp.2d 496, 502 (W.D.Tenn.1999)(consumers do not have a private cause of action under § 1681s-2(b)). Likewise, § 1681n provides a cause of action for willful violations, entitling a consumer to recover punitive damages in addition to the damages available for negligent noncompliance. Campbell, 90 F.Supp.2d at 756.
The FCRA does not provide any indication as to the level of investigation required under § 1681s-2(b)(1). First U.S.A. does not cite, nor does my independent research disclose, any case law defining the level of investigation required under this section. Section 1681s-2(b)'s investigation requirement for furnishers of credit information, however, is analogous to the requirement imposed upon credit reporting agencies under § 1681i(a) to reinvestigate a consumer's dispute regarding information contained in his credit report:
If the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute, the agency shall reinvestigate ... and record the current status of the disputed information, or delete the item from the file....
15 U.S.C. § 1681i(a). Courts interpreting § 1681i(a) have imposed upon credit reporting agencies a duty to conduct a reasonable reinvestigation. See Cushman v. Trans Union Corp., 115 F.3d 220, 224-25 (3rd Cir.1997); Henson v. CSC Credit Services, 29 F.3d 280, 286-87 (7th Cir.1994); Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1160 (11th Cir.1991); Pinner v. Schmidt, 805 F.2d 1258, 1262 (5th Cir.1986). Factors to be considered in determining whether a credit reporting agency has conducted a reasonable investigation include: (1) whether the consumer has alerted the agency that the initial source of the information may be unreliable or if the agency knows or should know that the source is unreliable, and (2) the cost of verifying the accuracy of the source versus the possible harm of reporting inaccurate information. Cushman, 115 F.3d at 225; Henson, 29 F.3d at 287. Whether a reasonable investigation has been conducted is generally a question of fact for the jury. Id.
I will adopt the reasonableness standard applied in cases addressing reinvestigations under § 1681i(a). Applying that standard, I believe that genuine issues of material fact exist as to whether First U.S.A. negligently failed to comply with § 1681s-2(b)(1)(A)'s investigation requirement. There is a definite factual dispute as to whether the information reported by First U.S.A. against plaintiff was accurate. First U.S.A. acknowledges in its memorandum in support of its motion for summary judgment, that "there remains a good faith dispute as to the liability for the accounts between [plaintiff] and Paula Bruce." The undisputed evidence in this case establishes the following facts: two credit reporting agencies notified First U.S.A. of plaintiff's disputes regarding the First U.S.A. accounts reported as delinquent; plaintiff repeatedly insisted through telephone conversations and written correspondence that the accounts had been fraudulently opened in his name by Paula Bruce; First U.S.A.'s investigation consisted solely of a review of its own internal records; First U.S.A.'s investigation revealed that the signatures on the credit card applications did not match plaintiff's signature; Paula Bruce was the only one ever to dispute a charge with respect to the First U.S.A. credit cards; and no one from First U.S.A.'s investigation unit spoke with either plaintiff or Paula Bruce regarding plaintiff's allegations. Plaintiff attests in his affidavit that he has never made a purchase with a First U.S.A. credit card and has never made a payment toward *1144 any balance on a First U.S.A. card. I believe that a rational jury considering this evidence could conclude that First U.S.A. negligently failed to take reasonable steps to verify the accuracy of the information that it reported to the agencies. Summary judgment is therefore inappropriate on plaintiff's claim of negligent violation of the FCRA.
To prevail on a claim for willful noncompliance with the FCRA and to recover punitive damages, a plaintiff must show that the defendant knowingly and intentionally committed an act in conscious disregard for the rights of others. Bakker v. McKinnon, 152 F.3d 1007, 1013 (8th Cir.1998); Cushman, 115 F.3d at 226. Plaintiff need not show malice or evil motive. Id. For the same reasons as stated above with respect to plaintiff's claim of negligent violation of the FCRA, I believe that there are genuine disputes of fact regarding plaintiff's claim that First U.S.A. willfully failed to conduct an investigation of his disputes. I am obligated at this point not to weigh the evidence or question its veracity, but to eliminate any claims upon which no rational trier of fact could find for plaintiff. Based upon the evidence described above, I am unable say as a matter of law that no reasonable jury could find that First U.S.A. willfully failed to investigate plaintiff's disputes. Therefore, summary judgment is inappropriate on this claim as well.
I also believe that plaintiff has presented evidence sufficient to create a material dispute regarding whether he incurred damages as a result of First U.S.A.'s alleged failure to conduct an appropriate investigation. First U.S.A.'s duty to investigate, and consequently any liability arising therefrom, did not commence until it received notice from a credit reporting agency that plaintiff disputed the First U.S.A. accounts. See 15 U.S.C. § 1681s-2(b)(1). A credit reporting agency's receipt of notice of a consumer dispute triggers its duty to notify the furnisher of the credit information within five days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2). CSC claims that April of 1998 was the first time plaintiff contacted either CSC or Equifax regarding his disputes of the First U.S.A. accounts. Plaintiff testified at his deposition, however, that he could not recall if April of 1998 was in fact his first time contacting those agencies, suggesting that he may have contacted them before that date. Plaintiff has presented evidence that he was denied credit opportunities on several occasions before April of 1998, and on at least one occasion after that date, in December of 1998. First U.S.A. strongly disputes that any cognizable economic damages arose from the December 1998 credit denial. Even assuming that First U.S.A. is correct, however, when I consider the facts in the light most favorable to the plaintiff, as I must, genuine issues of material fact remain as to whether any economic damages suffered by plaintiff before April of 1998 are actionable.
Furthermore, plaintiff has presented sufficient evidence of emotional distress damages to withstand summary judgment. See Bakker, 152 F.3d at 1013 (economic damages or "out-of-pocket" expenses not a prerequisite to award of damages under the FCRA; awarding actual damages based on mere claims of emotional distress); Millstone v. O'Hanlon Reports, Inc., 528 F.2d 829, 834-35 (8th Cir.1976)(awarding actual damages under the FCRA based on claims of emotional distress only); Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1332-33 (9th Cir.1995)(same); Stevenson v. TRW Inc., 987 F.2d 288, 296-97 (5th Cir. 1993) (emotional distress damages may include damages for embarrassment, humiliation and mental anguish).
Finally, I must reject First U.S.A.'s argument that under Missouri law plaintiff is estopped from denying responsibility for the First U.S.A. accounts because he accepted a benefit from the accounts when a $2,233.49 balance was transferred from his Commerce Bank credit card. Even if the state-law concept *1145 of estoppel was somehow applicable to plaintiff's federal claims, the argument cannot carry First U.S.A.'s motion for summary judgment. Genuine issues of material fact exist as to whether plaintiff was responsible for or even knew of the balance transfer from the Commerce Bank credit card. In his affidavit, plaintiff attests that he did not make and was not aware of any balance transfer from his Commerce Bank credit card unto a First U.S.A. credit card. He further attests that Paula Bruce was likely responsible for the transfer. These factual disputes preclude summary judgment based on an estoppel argument.
In sum, genuine issues of material fact exist as to whether First U.S.A. negligently and willfully violated § 1681s-2(b)(1)(A), and therefore summary judgment will be denied with respect to these claims.

B. Tortious Interference
To prevail on a claim for tortious interference with credit expectancy, plaintiff must prove: (1) a valid credit expectancy; (2) that defendant knew of the expectancy; (3) denial of credit induced or caused by the defendant's intentional interference; (4) absence of justification; and (5) damages. Bell v. May Dep't Stores Co., 6 S.W.3d 871, 876 (Mo.1999)(en banc); Nazeri v. Missouri Valley College, 860 S.W.2d 303, 316 (Mo.1993). First U.S.A. challenges only the justification element of plaintiff's prima facie case. A person is justified in interfering with the credit expectancy of another if by doing so the person is acting to protect his own economic interests. Bell, 6 S.W.3d at 876. As stated above with respect to plaintiff's claims under the FCRA, genuine issues of material fact exist regarding whether the information contained in plaintiff's credit report is false and whether First U.S.A. conducted a reasonable investigation to verify the information that it reported. Factual disputes on these issues necessarily create a factual dispute as to whether First U.S.A. was justified in its actions. Summary judgment is therefore inappropriate on this basis. Moreover, plaintiff has presented sufficient evidence of credit denials to withstand summary judgment on his tortious interference claim, and First U.S.A.'s estoppel argument fails for reasons stated above. First U.S.A.'s motion for summary judgment will be denied with respect to this claim.

C. Defamation
State-law privacy causes of action such as defamation are preempted by the FCRA:
Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence ... except as to false information furnished with malice or willful intent to injure such consumer.
15 U.S.C. § 1681h(e). This section has been interpreted as providing a qualified immunity unless the defendant furnished false information with malice or willful intent to injure. Thornton v. Equifax, Inc., 619 F.2d 700, 703 (8th Cir.), cert. denied, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). Although the FCRA does not define the terms "malice or willful intent," courts considering the issue have adopted the definitions that apply to these terms in libel law. Id. at 705. A statement is made with malice if the speaker made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." Id. (citing New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Reckless disregard requires evidence that the speaker entertained actual doubt about the truth of the statement. Wiggins v. Equifax Services, Inc., 848 F.Supp. 213, 223 (D.D.C.1993). The showing of malice or willful intent to injure under § 1681h(e) is a higher standard of proof than the willfulness required for punitive damages under § 1681n. Thornton, 619 F.2d at 706. Additionally, of course, it is a different factual issue: a plaintiff can recover punitive damages under the FCRA where the defendant willfully failed to conduct an investigation, *1146 while to prevail on a defamation claim the plaintiff must show that a false statement was made with knowledge or reckless disregard for its truth.
Plaintiff simply has not produced any evidence sufficient to meet this higher level of proof. The undisputed facts show that First U.S.A. concluded, whether erroneously or not, that the information it reported for plaintiff was correct and that fraud had not been committed. Nothing in the record indicates that First U.S.A. knew that the information it furnished regarding plaintiff's credit history was false or that it entertained any doubt about the veracity of the information and reported it anyway. As a result, there are no genuine disputes on this malice claim, and plaintiff's defamation claim is preempted by the federal law.

III. Conclusion

First U.S.A.'s motion for summary judgment will be granted with respect to plaintiff's state-law claim for defamation. The motion will be denied, however, with respect to plaintiff's claims of negligent and willful violation of the Fair Credit Reporting Act and tortious interference with credit expectancy. Finally, First U.S.A.'s motion to strike affidavits will be denied. This case will be reached first on the June 26, 2000 trial docket.
Accordingly,
IT IS HEREBY ORDERED that First U.S.A. Bank, National Association's motion for summary judgment [# 85] is granted in part and denied in part. First U.S.A. shall have summary judgment on plaintiff's state-law defamation claim, and that claim is dismissed with prejudice. First U.S.A.'s motion for summary judgment is denied in all other respects.
IT IS FURTHER ORDERED that First U.S.A.'s motion to strike affidavits [# 98] is denied.
NOTES
[1] Plaintiff settled his claims against Experian Information Solutions, Inc., CSC Credit Services, Inc., and Equifax Credit Information Services, Inc.
[2] First U.S.A. has filed a motion to strike plaintiff's affidavit. That motion, however, will be denied for reasons set forth below.
[3] Plaintiff's second amended complaint alleges that First U.S.A. failed "to conduct an investigation" as required by the FCRA. Based on the undisputed facts of this case and plaintiff's filings in opposition to First U.S.A.'s motion for summary judgment, however, the claims are more appropriately construed as challenges to the adequacy of the investigation that First U.S.A. conducted, not as challenges to whether First U.S.A. actually conducted an investigation.