**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**December 27, 2004**

**Charles R. Fulbruge III**
**Clerk**

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-21090
_____

CSC CREDIT SERVICES, INC., CREDIT BUREAU OF TULSA, INC.,
CSC ENTERPRISES INC.; CSC ENTERPRISES,

Plaintiffs-Appellants-Cross-Appellees,

versus

EQUIFAX INC.;
THE CREDIT BUREAU, INCORPORATED OF GEORGIA,

Defendants-Appellees-Cross-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas,
Houston Division
Civil Action No. H-99-4349

_____

Before JONES, SMITH, and STEWART, Circuit Judges.

EDITH H. JONES, Circuit Judge:[*]

This case involves a dispute over a sixteen-year-old contract that, despite the parties' stipulation that the document is "unambiguous," has resulted in two diametrically opposed orders from judges within the same district court. In this appeal, we review both summary judgment orders. For the reasons stated below, we **AFFIRM IN PART** and **REVERSE AND REMAND IN PART**, in favor of Equifax.

**I. Background**

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

The issue in this case is whether a 1988 contract between the two parties allowing CSC Credit Services, Inc. ("CSC") access to the storage and retrieval system maintained by Equifax, Inc. ("Equifax") also required giving CSC access to programs later developed by Equifax that analyze the data contained therein. CSC and Equifax are major, repeat players in the market for credit reporting services. CSC owns millions of credit files on individuals residing in Arkansas, Indiana, Iowa, Kansas, Nebraska, Oklahoma, Texas, and Wisconsin. Equifax is a credit reporting agency; unlike credit bureaus like CSC, Equifax collects and maintains credit files owned by other entities, and then sells access to the files. In some situations, the two companies compete with one another, and in others they collaborate and combine their respective resources.

In one of the collaborative endeavors, the parties entered into a contract under which Equifax stores all of CSC's credit files in its computer system, Automated Credit Reporting Online Package ("ACROPAC"). The 1988 Agreement for Computerized Credit Reporting Services and Options to Purchase and Sell Assets ("Agreement") allowed third-party credit-granting customers to access CSC's files through ACROPAC. For every file accessed, CSC agreed to pay Equifax a "billable inquiry" charge. Under the Agreement's "cost allocation system," CSC paid Equifax fifteen

2

percent of its revenue from each file.[1]  ACROPAC stores files owned by Equifax, CSC, and numerous other credit bureaus (which apparently entered into similar agreements with Equifax).

The contract also requires Equifax to bear the costs necessary to maintain and upgrade ACROPAC from time to time.  Since 1988, Equifax has updated the hardware and the software on numerous occasions.  These upgrades have expanded the number and type of search functions available to users (for example, allowing customers to search files by zip code and Social Security number), and have resulted in improvements to make ACROPAC faster and more efficient.  The contract also permits Equifax to modify the distribution of revenue from customers accessing credit files.  Equifax has unilateral authority in this regard, but any altered charges must be applied equally to all customers.

Additionally, Equifax created other products during this period.  One of them, "decisioning services," is at the center of this dispute.  This product synthesizes data from numerous sources (some of which are not owned by Equifax), and applies criteria provided by the customer to create a complete credit decision for a particular individual.  Equifax uses its NextGen computer system to perform this task.  Decisioning services offers a finished product, as opposed to the "raw material" provided by ACROPAC.

---

[1]     The Agreement does not explicitly include this percentage.  Instead, it establishes a general formula subject to change by the parties.  This formula, governed by Paragraph 8 of the Agreement, is discussed below.

Decisioning services relies upon numerous data sources, including but not limited to ACROPAC.[2]  Decisioning services may need to access only some of these products to give a customer a complete report.  When CSC files stored on ACROPAC are accessed during this process, CSC receives revenue and pays a billable inquiry fee as it would with a usual credit reporting transaction.  However, Equifax also deducts a "platform fee" from CSC's transaction revenue. Equifax asserts that this platform fee helps cover the costs associated with the NextGen system.

Equifax also used its purported authority under the Agreement to supplement the cost allocation system by assessing additional charges to CSC.  Beginning in 1989, Fair Isaac & Company ("FICO") developed a credit scoring model known as the Beacon Score.  A Beacon Score applies numerous factors from a credit report to assign a numerical grade to a given consumer.  This score allows a creditor to predict the likelihood that a potential consumer will be a credit risk.  When Equifax's customers purchase a credit report owned by CSC and also request a Beacon Score, FICO assesses a royalty.  To cover this expense, Equifax modified the revenue sharing agreement to pass this charge on to CSC.  Equifax continued to charge a separate fee after it developed its own

---

[2]     Up to sixteen sources may be used.  The other potential sources include Equifax ACIS, Income Predictor, HMC Gemini Verify, Equifax Exchanges, Equifax Canadian Consumer Credit, National Telecommunications Data Exchange, Experian Consumer Credit, Experian Small Business Data, Check Services, Check Authorization, RiskWise, Choice Point, Dun & Bradstreet, MetroNet, and Compliance Data Center.

credit scoring models. Although CSC did not initially object to this adjustment of the revenue sharing agreement, it now contests this "modeling royalty" fee.

In 1999, CSC filed the instant action, claiming that Equifax breached the 1988 Agreement by assessing the platform fees and modeling royalties.[3] Both parties moved for summary judgment, and Judge Gilmore found in Equifax's favor as to the platform fees on April 11, 2001. While Judge Gilmore was considering the parties' summary judgment motions, preparation for trial continued. On April 12, 2001, the parties, who had not yet received Judge Gilmore's Summary Judgment Order filed the previous day, consented to proceed before magistrate Judge Milloy under 28 U.S.C. § 636(c). Determining that Judge Gilmore's Order had not disposed of all issues in the case, Judge Milloy denied Equifax's motion for final judgment based on Judge Gilmore's conclusions and proceeded to consider the issue of modeling royalties. Based on a contradictory contract interpretation, Judge Milloy granted summary judgment to CSC sua sponte on the issue of modeling royalties on April 9, 2002. Additionally, on September 10, 2003, Judge Milloy granted CSC's motion for attorneys' fees pursuant to Texas Civil Practice & Remedies Code § § 38.001 et seq. Judge Milloy denied CSC's Motion for Reconsideration on the platform fees issue initially decided by

_____

[3] The initial Complaint included other claims against Equifax. The parties have resolved these other disputes, and only these two outstanding claims are before this court.

Judge Gilmore, and entered an Amended Final Judgment on September 29, 2003.  Both parties appealed to this court.

## II.  Standard of Review

We review a district court's grant of summary judgment <u>de novo</u>, using the same standards as the district court.  <u>U.E. Texas One-Barrington, Ltd. v. Gen. Star Indem. Co.</u>, 332 F.3d 274, 276 (5th Cir. 2003); FED. R. CIV. P. 56.  We review the district court's ruling on the motion for reconsideration only for an abuse of discretion.  <u>Lake Hill Motors, Inc. v. Jim Bennett Yacht Sales, Inc.</u>, 246 F.3d 752, 757 (5th Cir. 2001).

## III.  Judge Gilmore's Order Granting Summary Judgment to Equifax on Platform Fees

Judge Gilmore awarded summary judgment to Equifax on the claim that the 1988 Agreement required Equifax to provide the decisioning services to CSC without charging any additional fee.  After reviewing the law and the record, we agree that decisioning services is a discrete, analytical product that is not covered by the 1988 Agreement, and, thus, Equifax may assess the platform fees.  We therefore affirm this portion of the judgment.

As this is a diversity suit filed in Texas, Texas law applies.  28 U.S.C. § 1332; <u>Assicurazioni Generali, S.P.A. v. Ranger Ins. Co.</u>, 64 F.3d 979, 980 (5th Cir. 1995).  Under Texas law, contract interpretation is a matter of law for the court to decide.  <u>Elliott-Williams Co., Inc. v. Diaz</u>, 9 S.W.3d 801, 803 (Tex. 1999).  In construing a contract, "the court's primary

6

concern is to give effect to the written expression of the parties' intent." Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133 (Tex. 1994). The starting point of this analysis is the actual language of the contract. Empire Fire and Marine Ins. Co. v. Brantley Trucking, Inc., 220 F.3d 679, 681 (5th Cir. 2000) (citing Puckett v. U.S. Fire Ins. Co., 678 S.W.2d 936, 938 (Tex. 1984)).

Both parties agree, as do we, that this contract is unambiguous. When a contract is unambiguous, the court may not rely upon extrinsic evidence "to contradict or vary the meaning of the explicit language of the parties' written agreement." Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995). The court presumes that every phrase of the contract has some effect. Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). The effect of each phrase is determined by looking at the entire contract; "no one phrase, sentence, or section should be isolated from its setting and considered apart from the other provisions." Forbau, 876 S.W.2d at 134. Any contractual term that is not defined within the contract itself must be given its "plain, ordinary, and generally accepted meaning." Heritage Resources, Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996).

Looking to the Agreement as a whole, as required under Texas law, it appears that decisioning services, which is an analytical tool operated by a completely different computer system, NextGen, that accesses up to sixteen data bases, sometimes, but not

always, including ACROPAC, is not covered by the 1988 Agreement and, thus, Equifax may charge CSC platform fees for decisioning services. The ninety-six-page Agreement includes many exhibits, yet, as the district court noted, no other database or computer program other than ACROPAC is mentioned. Paragraph 4(a)(i) requires Equifax to furnish CSC only "ACROPAC online services." The Agreement further defines "online" to mean "direct access to credit information maintained in the ACROPAC system." Agreement ¶4(c); R. vol. 8 at 319. Direct access is obtained "by means of the appropriate inquiry through a terminal maintained by such Bureau [like CSC] or by a customer of such Bureau." Id.

Taken as a whole, the above provisions impose three specific limitations on the services Equifax must provide CSC. First, the parties' Agreement covers "online services," which implicate "direct access to credit information" maintained by ACROPAC. Second, the access must be generated via an "inquiry" by CSC or its customers. Additionally, the inquiry must originate from a "terminal maintained by [CSC] or by a customer of [CSC]." By contrast, decisioning services are not "maintained in the ACROPAC" system, but instead are in the NextGen system, which in turn directly accesses ACROPAC and up to fifteen other sources of information. See R. vol. 8 at 351-52. Decisioning services are not requested by CSC or a CSC customer, but are instead a separate product sold by Equifax to its own customers. CSC's response that "direct access" is not defined in the Agreement does not alter this

8

analysis. "Direct" usually and customarily[4] means "from point to point without deviation" or "by the shortest way." Webster's New Collegiate Dictionary (9th ed.) at 358. Decisioning services do not provide the shortest way to the raw credit information stored in ACROPAC; instead, this product provides a final answer to a potential creditor by analyzing the raw data. The Agreement covers only those situations where CSC or its customers enter ACROPAC directly.

CSC next argues that the district court's characterization of ACROPAC as only a storage and retrieval system required the court to read several other provisions out of the contract in contravention of Texas law. Specifically, CSC points to language in Exhibit A and the Agreement referencing "different computer systems," "all consumer credit reporting and similar or related services," and "any other sale of products or services derived from a consumer credit reporting database." We disagree. The language put forward by CSC is taken out of context. The relevant, complete language states,

> System software encompasses the following primary tasks: . . . Processing of credit grantor automated account history information to update and create new files on a periodic basis. ACROPAC II offers various programs to extract data from a wide range of different computer systems and record formats in order to process such data into the online system. . . .

---

[4]     See Heritage Resources, 939 S.W.2d at 121.

Exhibit A; R. vol. 8 at 239. This language, read in the broader context of the Agreement as a whole, describes ACROPAC's inherent function: storing data from many sources, updating the information, and making it available to credit grantors who access the system with their "different computer systems and record formats." See id.

Finally, CSC argues that decisioning services fall within the plain meaning of "new product developments" and "system enhancements" as defined by the Agreement. This reading of the contract would have the absurd result of requiring Equifax to provide to CSC, at no cost whatsoever, every new product it develops. See Tarrant Distributors Inc. v. Heublein Inc., 127 F.3d 375, 379 (5th Cir. 1997) (holding that an agreement "unambiguously supports one interpretation because the other [interpretation] is unreasonable"); Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 591 (Tex. 1996). As demonstrated above, the Agreement pertained only to the ACROPAC system. The provision cited by CSC reads, in whole, "[Equifax] shall provide, at [Equifax]'s expense, all new product developments, system enhancements, advertising and promotion of the ACROPAC system." Agreement ¶4(g); R. vol. 8 at 319. This language expressly limits itself to ACROPAC. Equifax complied with the "system enhancements" requirement by continuously updating the ACROPAC system hardware and software. Decisioning services represent a unique product sold by Equifax; the NextGen computer system runs this program, which

10

uses complex algorithms and decision-tree logic to provide a complete credit decision to a customer. The mere fact that decisioning services may utilize ACROPAC (or one of several other data sources, several of which are not owned by Equifax) does not make decisioning services part of ACROPAC or covered by the 1988 Agreement. Judge Gilmore's summary judgment order is affirmed.

### IV. Judge Milloy's Order Granting Summary Judgment to CSC on Modeling Royalties

After assuming control of the case pursuant to the parties' agreement, Magistrate Judge Milloy rejected Equifax's motion for final judgment. Although Judge Gilmore had found in Equifax's favor on the decisioning services fee issue, Judge Milloy's review of the record and Judge Gilmore's Order led her to conclude that the modeling royalties issue remained unresolved. She then determined that CSC should prevail on this issue and awarded CSC summary judgment sua sponte. Judge Milloy correctly found the modeling royalties issue in need of adjudication. However, because our reading of the Agreement, taken in its entirety, demands the opposite result, we reverse.

CSC asserts that it need pay only a single charge, the billable inquiry fee, in return for all of Equifax's services, including reports that include a credit score. Judge Milloy agreed with CSC that the "new product developments" and "system enhancement" language in Paragraph 4(g) included the credit scoring models. Based on the same reading of the Agreement applied to the

11

decisioning services issue, we disagree. The credit scoring model provides a number that a customer may analyze, leaving the application and final decision as to a specific, potential creditor to the customer. Thus, credit scoring models, in a similar, although more nuanced, manner as decisioning services, apply criteria to the data available on ACROPAC.

To conceptualize the difference, a spectrum is helpful: on one end of the spectrum are pure, raw data; on the other end is a complete, finalized credit answer like, "Lend Jane Doe $12,000." In this view, the scoring model is closer to "raw data" on the spectrum than decisioning services. Nevertheless, the credit scoring reports require the application of several analytical steps to the raw data; this process takes the credit scoring reports beyond the scope of ACROPAC and, thus, the Agreement. The affidavit of CSC's own witness confirms this understanding: the credit scoring reports involve analysis of the data contained within ACROPAC. See R. vol. 7 at 725-36. Nothing in Paragraph 4(g) requires Equifax to provide CSC with any "new" or "enhanced" product beyond the scope of ACROPAC. Therefore, the credit scoring models, which are separate products from ACROPAC, do not fall under this provision.

The credit scoring models were thus subject to royalty charges as provided by Paragraph 8(c) of the Agreement. See R. vol. 8 at 310. This provision allows Equifax, in its sole discretion, to impose royalty fees for services provided beyond

12

access to ACROPAC.[5]  Equifax has exercised this discretion before. When a customer seeks Beacon Scores, for example, a royalty is charged.  CSC has not disputed these charges, but now claims that Equifax cannot impose similar charges for its own scoring models. CSC's sole reliance for this distinction is on the "new product development" and "system enhancement" language, which we have determined does not apply to this service.  We therefore reverse that part of the judgment that favored CSC on this issue and remand for further proceedings.

### V.  Judge Milloy's Order Denying CSC's Motion for Reconsideration

After prevailing on the issue of modeling royalties, CSC moved for reconsideration of the platform fee issue based on new evidence.  Judge Milloy denied this motion.  Because the court did not abuse its discretion in denying this motion, we affirm.  See Lake Hill Motors, 246 F.3d at 757.

Hoping to persuade Judge Milloy to overturn Judge Gilmore's Order, CSC moved for reconsideration based on new evidence, namely, a contract between Equifax and DealerTrack.Com, another credit reporting company.  See R. vol. 2 at 1753-66.  This contract also referenced ACROPAC.  However, the contract is between Equifax and a third party, uses different terms, and was drafted 14 years after the Agreement at issue here.  Even assuming that this

---

[5]     This discretion is not unfettered.  Any alteration in the cost allocation must be applied equally to all of Equifax's affiliates and subsidiaries.

13

contract is probative, it constitutes parol evidence.  Because CSC stipulated (as did Equifax) that the Agreement is unambiguous, this contract is inadmissible under the Texas parol evidence rule.  <u>Sun Oil Co. v. Madeley</u>, 626 S.W.2d 726, 732 (Tex. 1981).  Inadmissible evidence cannot be used to support a motion for summary judgment, so Judge Milloy rightly rejected the introduction of this evidence.  <u>See</u> <u>Instone Travel Tech Marine & Offshore v. Int'l Shipping</u>, 334 F.3d 423, 431 (5th Cir. 2003).

## VI.  Conclusion

For the reasons stated above, we **AFFIRM IN PART**, and **REVERSE and REMAND IN PART**, all in favor of Equifax.  Because we reverse the award of partial summary judgment to CSC by the district court, the order awarding attorneys' fees to CSC is similarly **REVERSED**.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

14