**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 24, 2006**

**Charles R. Fulbruge III**
**Clerk**

REVISED AUGUST 11, 2006

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 05-20578

KENNETH M. MORRIS,

Plaintiff-Appellant,

versus

EQUIFAX INFORMATION SERVICES, LLC,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before GARWOOD, HIGGINBOTHAM, and CLEMENT, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant Kenneth M. Morris (Morris) appeals the district court's summary judgment in favor of defendant-appellee Equifax Information Services, LLC (Equifax). On Morris's claim under the Fair Credit Reporting Act (FCRA), we reverse and remand. On Morris's state law claim for libel, we affirm.

**Facts and Proceedings Below**

On July 3, 2003, Morris obtained a "3-in-1 Credit Report" through TrueCredit's internet website.[1]  The 3-in-1 report purported to show Morris's account history information as provided by the three major credit reporting bureaus: Experian, TransUnion, and Equifax.[2]  The 3-in-1 report from July 3 contained several pieces of information about Morris that he wanted either changed or deleted.  Morris wrote a letter to Equifax[3] on July 16, 2003, identifying these items and stating, "False information in the credit report that you disseminate about me is causing me harm." One of the items identified by Morris for correction was a charge account with RNB-Target (Target).  The 3-in-1 report showed that Experian, TransUnion, and Equifax all reported that Morris had joint responsibility for this account, that the account's condition was "Derogatory" and its pay status was "Collection/Chargeoff" of the past due amount of $253.  In his letter to Equifax, Morris

---

[1]The TrueCredit website states that TrueCredit is "[m]ajority owned by TransUnion."  *See* http://www.truecreditcorporate.com/about.html (last visited June 26, 2006).  In addition, the printout of Morris's TrueCredit "3-in-1 Credit Report" includes the following statement: "Brought to you by TransUnion."

[2]The 3-in-1 report also showed a list of the companies that had recently requested Morris's credit report and the date of each request.  For each entry on this list, a credit bureau was also listed; presumably, the bureau listed was the one that provided to TrueCredit the data on that entry on the list.  The only three credit bureaus identified in this list were Experian, TransUnion, and Equifax.

[3]Morris also wrote letters to TransUnion and Experian, but only the letter to Equifax is involved in this case.

stated, "I owe Target nothing," and explained that the account in question had been opened by Rebecca Morris while she was married to Morris, that the account was never a joint account, that Morris divorced Rebecca in April 2001, and that the charge in question had been effected by Rebecca in late 2001 after the divorce. In the letter to Equifax, Morris stated that he had informed Target of his position on this account, and he also stated that "Target's bureaucratic bungling is solely responsible for this false information that Target has furnished to you." Morris demanded that Equifax correct the information about the Target account and also that Equifax show the information as "disputed" in the meantime. Morris's letter also requested that Equifax give its immediate attention to the disputed items and stated that Morris was in the process of refinancing his home mortgage and that he would hold Equifax responsible for substantial damages in the event he could not obtain the lowest interest rate available because of an incorrect credit report.

Equifax received Morris's letter on July 19, 2003. Equifax took none of the action demanded by Morris, but instead responded by sending Morris a letter dated July 24, 2003, stating that "Equifax does not maintain or service the information contained in your credit file." Equifax's letter also informed Morris that his letter of July 16 had been forwarded to CSC Credit Services (CSC), which, according to Equifax, is "the credit reporting agency which

3

researches the credit file concerns of consumers living in [Morris's] area." The July 24 letter from Equifax also provided Morris with contact information for CSC and directed Morris to contact CSC if he had any further concerns or needed additional help.

It is not clear from the record when Equifax actually mailed Morris's July 16, 2003 letter to CSC, but it is clear that CSC received the forwarded letter on July 29, 2003. In response to Morris's letter, CSC sent an Automated Consumer Dispute Verification (ACDV) to Target on August 1, 2003. In its August 13, 2003 response to CSC, Target did *not* tell CSC to stop reporting the account in question as a joint account with Morris. Equifax admittedly, and CSC allegedly, did not report the results of this reinvestigation to Morris in August 2003. In September 2003, CSC sent another ACDV to Target. In its September 19, 2003 response to CSC, Target again did not tell CSC to stop reporting the account as a joint account. While Equifax again did not report the results of this reinvestigation to Morris, CSC did report the results to Morris by letter dated October 3, 2003, seventy-six days after Equifax received Morris's dispute letter (and sixty-six days after CSC received Morris's letter forwarded from Equifax).

On October 31, 2003, Morris obtained a "3 Bureau Online Credit

4

Report" from consumerinfo.com.[4]   This 3 Bureau report, like the 3-in-1 report from July 3, 2003, purported to show Morris's account history information as provided by the three major credit reporting bureaus: Experian, TransUnion, and Equifax.  On the 3 Bureau report from October 31, 2003, the past due amount of $253 from the disputed Target account was still displayed under all three of the major bureaus, although Equifax no longer reported it as a "RNB-Target" account as did Experian and TransUnion, but instead reported it under the account heading of "Retailers National B." The remarks in the Equifax column for "Retailers National B" stated, "Consumer says acct. is responsibility of separated or divorced spouse."  In addition, the payment status for this account was shown in the Equifax column as "Bad debt & placed for collection & skip."     On January 8, 2004, Morris filed suit in Texas state court against both Equifax and CSC asserting claims for violations of the reinvestigation requirements of the Fair Credit Reporting Act, 15 U.S.C. §1681i, and also a state law libel claim. In this original petition, Morris alleged damages from receiving higher insurance quotes and from being unable to refinance his mortgage at a more favorable rate.  Equifax, with CSC's consent, timely removed the case to the United States District Court for the Southern District of Texas.

---

[4]On its website, ConsumerInfo.com identifies itself as "An Experian company."  *See* http://www.consumerinfo.com (last visited July 5, 2006).

In mid-January 2004, Morris received a letter from Capital One disapproving Morris's request for a Capital One credit card. In its letter, known as an "adverse action" letter from the requirements of 15 U.S.C. § 1681m, Capital One provided the following reasons, *inter alia*, for not approving Morris's request: the "presence of a collection record" and "too many 30-day delinquencies on Installment Trades." The Capital One letter also stated that its decision "was based in whole or in part on information contained in consumer credit report [sic] obtained from the credit bureau(s) listed below." The letter then listed Equifax, Experian, and TransUnion. About the same time, Morris received a letter from Citibank disapproving Morris's application for a Citi Platinum Select MasterCard account. Citibank identified the following reason for its disapproval: "A delinquent credit obligation(s), either paid or unpaid, was recorded in your credit bureau report." Much like the Capital One letter, the Citibank letter stated that the "decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below." Unlike Capital One, however, the Citibank letter listed only one consumer reporting agency — Equifax. Neither the Capital One letter nor the Citibank letter made any mention of CSC.[5]

---

[5]According to the FTC, the consumer report user's adverse-action letter "should provide the name and address of the consumer reporting agency from which it obtained the consumer report, *even if that agency obtained all or part of the report*

6

On January 24, 2005, Morris filed his first amended complaint, which incorporated the January 2004 denials of credit by Capital One and Citibank. At some point Morris sued Target in a separate action and following that suit Target sent (to precisely whom is unclear) a universal automated data form resulting in the challenged information being removed from consumer credit reports on file respecting Morris. Morris and CSC settled and on March 4, 2005, Morris filed an unopposed motion to dismiss without prejudice his claims against CSC, which was granted on March 8, 2005, dismissing CSC from the present case.

On March 22, 2005, Morris filed a motion for partial summary judgment based on Equifax's admission that it did not comply with the FCRA's reinvestigation provisions, 15 U.S.C. § 1681i. Also on March 22, Equifax filed a motion for summary judgment on both of Morris's claims, arguing that its receipt of Morris's dispute letter did not trigger any obligation on its part to comply with section 1681i, and on the ground that Morris's libel claim was barred under section 1681h(e)[6] and conditional privilege under

_from another agency_." FTC Commentary on the Fair Credit Reporting Act, 16 C.F.R. pt. 600, App. § 615 ¶ 13 (emphasis added).

[6]Section 1681h(e) provides:

"(e) Limitation of liability

Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any

7

Texas state law.   The case was referred to a magistrate judge who, on June 10, 2005, recommended that the district court deny Morris's motion for partial summary judgment and grant Equifax's motion for summary judgment.   The magistrate judge  recommended summary judgment for Equifax on Morris's FCRA claim because CSC, not Equifax, owned Morris's file and only CSC had the authority to modify the information in Morris's file.  The magistrate judge also recommended summary judgment for Equifax on the libel claim because "the court finds that Plaintiff failed to raise a fact issue on malice or willful intent."  In addition, the magistrate judge noted that, although "[t]he record demonstrates that Equifax published Plaintiff's credit information[,] [n]othing in the record suggests that Equifax knew or should have known at that time that the information was false."

Morris filed objections to the magistrate judge's memorandum and recommendation, arguing that the language of the FCRA does not allow a consumer reporting agency to avoid the reinvestigation obligations of 15 U.S.C. § 1681i simply because it does not "own"

---

user of information, or any person who furnishes
information to a consumer reporting agency, based on
information disclosed pursuant to section 1681g, 1681h,
or 1681m of this title, or based on information
disclosed by a user of a consumer report to or for a
consumer against whom the user has taken adverse
action, based in whole or in part on the report except
as to false information furnished with malice or
willful intent to injure such consumer."

15 U.S.C. § 1681h (1998).

the file.  In his objections, Morris also argued that he had raised a fact issue concerning Equifax's "malice" in that his evidence shows "Equifax knew of the falsity because Morris told them of the falsity, and Equifax did nothing but continue to publish the same false information without any effort to ascertain the truth." After reviewing Morris's objections, the district court, on June 28, 2005, adopted the magistrate judge's memorandum and recommendation and entered a final judgment that Morris take nothing against Equifax.  Morris timely appealed.

**Jurisdiction and Standard of Review**

The district court had jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, and we have jurisdiction under 28 U.S.C. § 1291. We review a district court's grant of summary judgment *de novo*. Summary judgment is proper if, after adequate opportunity for discovery, the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Young v. Equifax Credit Information Services, Inc.*, 294 F.3d 631, 635 (5th Cir. 2002).

**Discussion**

*1.  The Fair Credit Reporting Act Claim*

  *A. Background*

The purpose of the Fair Credit Reporting Act (FCRA) is "to

require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit. . . . in a manner which is fair and equitable to the consumer . . . *in accordance with the requirements of this subchapter.*" 15 U.S.C. § 1681(b) (1998) (emphasis added). In July 2003, when Morris sent his dispute letter to Equifax, the FCRA provided the following general requirements for reinvestigations by a consumer reporting agency:

> "If the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute, the agency shall reinvestigate free of charge and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer." 15 U.S.C. § 1681i(a)(1)(A) (1998) *amended by* Fair and Accurate Credit Transactions (FACT) Act of 2003, § 316, Pub. L. 108-159, 117 Stat. 1952, 1996.[7]

---

[7]Section 1681a provides: "(g) The term 'file', when used in connection with information on any consumer, means all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored."

In December 2003, the general requirements of § 1681i(a)(1)(A) were amended to accommodate new, less stringent requirements for consumer reporting agencies known as "resellers." The amendments were part of the Fair and Accurate Transactions (FACT) Act of 2003, which tasked the Federal Trade Commission and the Board of Governors of the Federal Reserve System to jointly establish the effective dates for the various provisions of the FACT Act. The relevant changes to § 1681i were made effective December 31, 2004. 16 C.F.R. § 602.1(c)(3)(xvi-xvii). Thus, it is the pre-FACT Act version of the FCRA that governs this case. Nonetheless, the general requirements for reinvestigation now provide:

10

> "*Subject to subsection (f) of this section*, if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, *or indirectly through a reseller*, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer *or reseller*."  15 U.S.C.  § 1681i(a)(1)(A) (Supp. 2006) (emphasis added).

The italicized portions above represent the additions made to this subsection by the FACT Act.  The FACT Act also defined "reseller" for the first time:

> "The term 'reseller' means a consumer reporting agency that--

> (1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and

> (2) does not maintain a database of the assembled or merged information from which new consumer reports are produced."  15 U.S.C.  § 1681a(u) (Supp. 2006).

The FACT Act also added new subsection 1681i(f), which provides less stringent reinvestigation requirements for resellers.  Under § 1681(f) resellers are made exempt from the reinvestigation requirements of § 1681 except that resellers who receive notice of a dispute from a consumer must, within five business days of receiving the notice determine whether the reseller's act or omission resulted in the disputed information being inaccurate or incomplete and, if not, the reseller, within the same five business days, must convey the notice of the dispute, along with all relevant information provided by the consumer, to the consumer reporting agency from which the reseller obtained the disputed information.  15 U.S.C.  § 1681i(f)(Supp. 2006).  That consumer reporting agency must then conduct its reinvestigation per § 1681i and provide the results of the reinvestigation to the reseller which must immediately convey those results to the consumer.  *Id.*

11

Morris alleges that Equifax failed to meet the requirements of section 1681i after Morris notified Equifax directly of his dispute with the credit information that Equifax had reported to TrueCredit and that Morris had seen on the 3-in-1 Credit Report.[8] In its motion for summary judgment, Equifax does not argue that it met the section 1681i requirements, but instead argues that "Equifax does not have a duty to reinvestigate consumer disputes on credit files owned by affiliates." To understand this argument, one needs first to understand the relationship between Equifax and CSC. Although Equifax is a nationwide consumer reporting agency, it does not "own" credit files on consumers living in certain geographic areas. In these certain areas, Equifax contracts with a wholly separate entity – referred to (perhaps misleadingly) as an affiliate – which does own a credit file on the consumers in that area. One such is former defendant CSC, whose territory encompasses all or parts of eight states, including the area of Texas in which Morris lives, and whose consumer files number in the tens of millions. Like Equifax, CSC is generally a consumer reporting agency. Equifax and CSC have entered into a contract under which CSC stores its credit

---

[8]"A consumer reporting agency's obligation to reinvestigate disputed items is not contingent upon the consumer's having been denied a benefit or having asserted any rights under the FCRA other than disputing items of information." FTC Commentary on the Fair Credit Reporting Act, 16 C.F.R. pt. 600, App. § 611 ¶ 9.

files in an Equifax-owned computer system known as ACROPAC.[9]  When a CSC-owned file such as Morris's is stored in ACROPAC, apparently any customer of either Equifax or of any of Equifax's "affiliates" (including CSC) can obtain the information contained in the CSC file.  It likewise appears that:  CSC pays Equifax a fee for each billable inquiry that is made into the ACROPAC system as to any CSC-owned file; in addition, the revenue associated with each billable inquiry is shared between the file's "owner" (in this case, CSC) and the company (either Equifax or one of the affiliates) whose customer makes the billable inquiry.  Thus, as we generally understand it:  when a CSC customer requests Morris's credit report, all of the revenue from that billable inquiry would go to CSC, and CSC would then pay Equifax the billable inquiry fee; on the other hand, when an Equifax customer requests Morris's credit report, CSC and Equifax divide the revenue and CSC then pays Equifax the same billable inquiry fee.

> *B.  File ownership*

---

[9]Under this contract, the ownership of the credit file is based on the residence of the consumer.  If Morris were to move out of a CSC area and into an area where Equifax owned the credit files, his credit file in the Equifax system would then apparently be owned by Equifax rather than CSC.  Conversely, when a consumer moves from an Equifax area into a CSC area, the credit file previously owned by Equifax would apparently then be owned by CSC.  The ACROPAC system is generally described in our unpublished opinion, *CSC Credit Services, Inc. v. Equifax Inc.*, 119 Fed. Appx. 610, 611-12 (5th Cir. Dec. 27, 2004).  Equifax states that approximately 20% of the credit files in ACROPAC are owned by Equifax's affiliates, and that CSC is by far the largest affiliate.

13

Equifax's summary-judgment argument relied on its contractual relationship with CSC. At the district court, Equifax did not dispute that it is in general a consumer reporting agency; instead, Equifax simply argued that it was CSC's responsibility — not Equifax's — to reinvestigate Morris's dispute. According to Equifax, because CSC "owns" Morris's file and only CSC can lawfully make any deletions, additions or alterations to it, only CSC is subject to the requirements of section 1681i respecting that file.

The district court, by adopting the magistrate judge's memorandum, noted that, although "[t]he parties agree that Equifax and CSC are consumer reporting agencies[,] . . . [t]he question is whether Equifax is the consumer reporting agency on which the statute places the burden of investigation for Plaintiff's credit file." The district court accepted Equifax's argument, holding that "[t]he better interpretation [of section 1681i] is that the consumer reporting agency that owns the consumer's file and has the authority to modify the information therein is the only agency obligated by section 1681i to reinvestigate the challenged credit report."

While no federal court of appeals has addressed this question, Equifax has successfully made this argument in at least two other federal district courts. *See Zotta v. NationsCredit Financial Services Corp.*, 297 F. Supp. 2d 1196, 1206 (E.D. Mo. 2003)("In light of plaintiffs' concession that Equifax does not own and

14

maintain plaintiffs' credit files . . . , the court concludes Equifax is entitled to summary judgment."); *Slice v. ChoiceDATA Consumer Services, Inc.*, No. 3:04-CV-428, 2006 WL 686886, *6 (E.D.Tenn. March 16, 2006) ("[B]ecause Equifax does not own plaintiff's credit file, it cannot be liable for conducting a reinvestigation of that file.") (citing the lower court's opinion in the present case). *Cf*. *Gohman v. Equifax Information Services, L.L.C.*, 395 F. Supp. 2d 822, 826 n.3 (D. Minn. 2005) ("[T]he court . . . declines to hold that Equifax is not subject to section 1681e merely because it does not own or maintain plaintiff's file. Section 1681e(b) is not limited to [consumer reporting agencies] who own and maintain credit files.").[10]

The district court in this case did not mention *Gohman*, but it did cite *Zotta*. The court acknowledged that the *Zotta* case is wanting in legal analysis, but held that *Zotta* "seems to reach the

---

[10]Section 1681e(b) provides that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b) (1998).

However, in *Gohman* the evidence showed "that Equifax prepared her [plaintiff's] consumer reports, including the report" allegedly causing the claimed damage. 395 F. Supp. 2d at 826 n.3. Here the district court did not determine (and the evidence does not show) that Equifax "prepared" the consumer report in question on Morris. *Slice* distinguishes *Gohman* on the basis that, unlike the situation in *Gohman*, "Equifax did not prepare any of the consumer reports at issue in this case." *Slice*, 2006 SW 686886, at *6.

15

correct conclusion."[11]  We disagree.

The version of section 1681i that governs this case does not distinguish between the consumer reporting agency (CRA) that "owns" the consumer's credit file and the CRA that sells, or, to use Equifax's term, "distributes" the consumer's credit file.  The more recent version of section 1681i, however, as amended by the FACT Act, does distinguish between a CRA and a CRA that operates as a "reseller."  *See supra* note 7.  It is possibly helpful to understand why Congress added the reseller provisions to section 1681i.  Under the pre-FACT Act version of section 1681i, the

---

[11]In this case, the magistrate judge's memorandum to the district court also cited the following language from *Bruce v. First U.S.A. Bank, Nat'l Ass'n*, 103 F. Supp.2d 1135, 1140 (E.D. Mo. 2000): "When a consumer in Missouri disputes an item on an Equifax or CSC credit report, CSC is responsible for performing the necessary investigations, updates or revisions."  The quoted language from *Bruce* is not particularly helpful, however, because both Equifax and CSC had already settled out of that case and the quoted language comes from *Bruce*'s "Factual Background" section and plays no part in the decision.  *See id.* at 1139–40.

The *Bruce* opinion, however, is interesting for another reason related to the reinvestigation of consumer disputes.  In *Bruce*, as in this case, CSC "owned" the consumer's [Bruce's] credit file.  *Id.* at 1140.  When Bruce first disputed account information that was reported by Equifax, it was CSC that reinvestigated by sending a consumer dispute verification (CDV) to First U.S.A. Bank.  *Id.* at 1140-41.  However, when Bruce then sent to Equifax another dispute letter, "[t]his time, Equifax forwarded a CDV form to First U.S.A."  *Id.* at 1141.  According to the *Bruce* opinion, "First U.S.A. returned the form to CSC."  *Id.*  This appears to possibly be an example of Equifax conducting a reinvestigation for a file that is not owned by Equifax, but by CSC.  Although Equifax has never stated in this case that it could not have conducted a reinvestigation of Morris's file, it implied as much.  Equifax, however, has always expressly maintained that it could make no change in a CSC file.

16

Federal Trade Commission (FTC) seems to have enforced the requirements of section 1681i generally against CRAs involved in reporting the consumer's information — not against just the CRA that owned the consumer's credit file, but also against CRAs that acted as resellers of that file. *See In the Matter of First American Real Estate Solutions, LLC*, 127 F.T.C. 85 (1999). In hearings on H.R. 2622, which became the FACT Act, the FTC testified, "Persons who purchase consumer reports for resale (also known as 'resellers') are covered by the FCRA as consumer reporting agencies and have all the obligations of other CRAs, including the duty to reinvestigate . . . ." *H.R. 2622—Fair and Accurate Credit Transactions Act of 2003*: *Hearing Before the H. Comm. on Financial Services*, 108th Cong. (July 9, 2003) (prepared statement of the Federal Trade Comm'n). Although the FTC applied the requirements of section 1681i to resellers, it recognized that these requirements "do not work well when applied to resellers." *Id.*[12]

---

[12]The FTC recognized the following problems that a reseller faces when attempting to comply with the reinvestigation requirements of § 1681i:

> "[T]he reseller may meet resistance in getting the creditor who originally furnished the information to investigate the dispute, because the creditor has no relationship with the reseller. Yet, if the reseller sends the dispute to the relevant repository [the CRA that maintains the consumer's file], that repository currently has no legal obligation to reinvestigate, because the dispute did not come directly from the consumer." *H.R. 2622—Fair and Accurate Credit Transactions Act of 2003: Hearing Before the H. Comm. on Financial Services*, 108th Cong., Serial No. 108-47,

17

Nonetheless, prior to the FACT Act's amendments, the FTC seems to have considered the requirements of section 1681i to be generally applicable to CRAs that were notified of a dispute directly by the consumer, whether they be the owner of the file or a reseller of the file. While the FTC's position on this question is only advisory in nature, it may provide helpful guidance to the courts. *See Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 149 n.4 (5th Cir. 1983). Because the governing version of section 1681i does not distinguish between a CRA that owns the consumer's credit file and a CRA that distributes the consumer's credit file, we hold that the mere fact that a CRA does not own a consumer's file does not of itself necessarily relieve that CRA of the reinvestigation requirements of the FCRA, 15 U.S.C. § 1681i.[13]

Our opinion in this respect is bolstered by the precise scenario presented in this case, in which CSC initially was not

_____

at 216 (July 9, 2003) (prepared statement of the Federal Trade Comm'n).

Based in part on these problems, the FTC supported the FACT Act's amendments to § 1681i in order "to better address reinvestigation duties when a reseller is involved." *Id.* The amended version of § 1681i addresses at least some of these problems. *See supra* note 7.

[13]Equifax has not argued that here it would be a "reseller" *as defined* in the FACT Act amendments to the Fair Credit Reporting Act (see note 7, *supra*). Rather, it stated at oral argument "we don't meet the technical terms of the reseller prong . . . [because] we do not maintain a database . . . I do not believe that the relationship here is addressed in the Fair Credit Reporting Act." *See* 15 U.S.C. § 1681a(u) (Supp. 2006) (". . . maintain[] a database . . . from which new consumer reports are produced").

18

notified directly by Morris of the dispute. Under the governing version of section 1681i, CSC arguably did not have a statutory obligation to conduct a reinvestigation when Equifax forwarded Morris's dispute letter to CSC because Morris did not notify CSC directly of his dispute. *See Whelan v. Trans Union Credit Reporting Agency*, 862 F.Supp. 824, 832–33 (E.D.N.Y. 1994) (granting summary judgment for CRAs alleged to have violated § 1681i because the consumer did not notify the CRAs directly of his dispute but instead notified the creditor who had furnished the disparaging information and that creditor then notified the CRAs); *see also* FTC statement quoted *supra* note 12. If Equifax's interpretation is combined with such an application of the "notify directly" requirement of section 1681i, neither Equifax nor CSC were obligated under section 1681i to reinvestigate Morris's dispute.[14] While Equifax forwarded Morris's letter to CSC, Equifax says it did this due to its own internal policy, not due to any FCRA requirements.[15]

---

[14]Equifax states that CSC has admitted in this case to having the responsibility to comply with the reinvestigation requirements of § 1681i.

However, under *Gohman*, *if* Equifax "prepare[d]" a consumer report on Morris it was required by § 1681e(b) to follow reasonable procedures to achieve accuracy. *See* note 10 *supra*.

[15]In its brief to this court, after Equifax stated that it is "the policy and procedure of Equifax . . . to forward any such mail to the correct Affiliate immediately upon receipt of such mail by Equifax," Equifax went on to state, "This is beyond what the FCRA requires."

The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures . . . in accordance with the requirements" of the FCRA.  15 U.S.C. § 1681(b) (1998).  Here, Morris viewed adverse credit information apparently transmitted to TrueCredit from the Equifax computer, and Morris then contacted Equifax directly to dispute the accuracy of that information in accordance with the FCRA.  Section 1681i provides the "Procedure in case of disputed accuracy" and includes specific time requirements to ensure that consumer disputes are handled expeditiously.  The procedures adopted by Equifax, while arguably reasonable, are not in accord with the requirements of section 1681i.

*C.  Other section 1681i liability issues*

Equifax also argues that, "although Equifax is a consumer reporting agency, it did not act as one here because it did not 'assemble' or 'evaluate' the consumer credit information contained in Morris' credit file. . . .  Equifax's role here was merely that of distributor."  The FCRA defines a consumer reporting agency (CRA) as follows:

> "[A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."  15 U.S.C.  § 1681a(f)

20

(1998).[16]

The district court did not address whether Equifax either assembled or evaluated consumer credit information with respect to Morris, or acted as a CRA respecting Morris, within the meaning of section 1681a(f). Equifax did not expressly make that argument in the district court and it is not clear to us that the present record evidence adequately resolves those questions (or whether Equifax "prepared" a consumer credit respecting Morris).[17] In these circumstances we

---

[16]The FCRA does not define any version of "assemble" or "evaluate." Nor is there any such definition in any applicable regulation. Moreover, 15 U.S.C. § 1681e(e)(2) identifies the "Responsibilities of procurers for resale," which indicates that, at least for purposes of § 1681e, a "procurer[] for resale" is distinct from a "consumer reporting agency." On the other hand, an FTC staff opinion letter has stated that "it is clear from a review of the legislative history that Congress intended for the FCRA to cover a very broad range of 'assembling' or 'evaluating' activities" and notes legislative history indicating that resellers are considered consumer reporting agencies even though a reseller "may do nothing more than transmit to their customers a report obtained from another consumer reporting agency." FTC Staff Opinion Letter (June 9, 1998), available at 1998 WL 34323759.

15 U.S.C. § 1681s(a) (1998) gives the FTC administrative and enforcement powers respecting the FCRA.

[17]Other possibly relevant aspects of the relationship between Equifax and CSC and their respective customers with regard to individuals whose files are owned by CSC but are stored on the Equifax ACROPAC computer system are unclear and largely unexplained in the record as well as not being expressly addressed by the district court. Nor does the record reflect the precise content of the information transmitted out of the Equifax ACROPAC computer system with respect, for example, to whether (or how or in what circumstances) it identifies the file owner (e.g., CSC in Morris's case) and/or the "evaluator" of the information therein or the like. Nor does the record reflect whether any of

21

conclude that it is preferable that Equifax's contentions in this respect be addressed in the first instance by the district court on remand.[18]

*2.  The Libel Claim*

In his Texas law libel claim Morris alleges that Equifax libeled him by continuing to publish the adverse credit information regarding the Target account after Morris notified Equifax that the information was false.  In its motion for summary judgment, Equifax argues that Morris's state law libel claim is precluded under both 15 U.S.C. § 1681h(e) and Texas's law of conditional privilage.

Section 1681h(e) bars a consumer from bringing any claim "in the nature of defamation . . . with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency . . . except as to false information furnished with malice or willful intent to injure such consumer."  15 U.S.C. § 1681h(e) (1998).  In addition, the Supreme Court of Texas has agreed, with certain limitations not applicable here, that "reports of mercantile or other credit-reporting agencies, furnished in good

---

the material comprising Morris's file in the Equifax ACROPAC computer system was "recorded" by Equifax (see § 1681a(g), note 7 *supra*).

[18]To the extent summary judgment is employed on remand, the court will, of course, have to determine whether the material facts are undisputed, and, to insure that the respective parties have proper notice, further summary judgment motions and responses would appear to be necessary.

faith to one having a legitimate interest in the information, are privileged." *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 898 (Tex. 1970) (quotations omitted). As the Texas Supreme Court explained, "Such privilege is termed conditional or qualified because a person availing himself of it must use it in a lawful manner and for a lawful purpose. The effect of the privilege is to justify the communication when it is made without *actual malice*." *Id.* at 899 (emphasis added; quotations omitted). Morris does not allege that Equifax willfully intended to injure him, but he does allege "malice." Although the FCRA does not define malice, we have previously applied the common-law standard for malice when both parties agreed to such application. *See Cousin v. Trans Union Corp.*, 246 F.3d 359, 375 (5th Cir. 2001) (requiring the plaintiff to show that "the defendant when he published the words — (1) either knew they were false, or (2) published them in reckless disregard of whether they were true or not"). In this case, we cannot say the parties agree to such application because Equifax has not addressed the "malice" exception to preemption under section 1681h(e). Morris has relied on *Thornton v. Equifax*, 619 F.2d 700 (8th Cir. 1980), an FCRA case in which the Eighth Circuit "cite[d] the *New York Times* standard as an example of a type of malice necessary to overcome a qualified privilege." *Id.* at 705.

23

(citing *New York Times v. Sullivan*, 84 S.Ct. 710, 726 (1964)).[19] We apply that standard in this case, and we agree with the district court that Morris presented no evidence that Equifax published false statements about Morris knowing the statements were false or with a reckless disregard of whether they were false.

While Morris has presented evidence that Equifax knew that Morris claimed that there were false statements in the information that Equifax was publishing about Morris, this evidence does not show that Equifax knew these statements were false. Morris also argues that Equifax had a reckless disregard for whether the statements were false because "Equifax continued to publish the same false information about Morris without lifting a finger to determine whether the information was false or not." To show "reckless disregard," however, Morris must present "sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts* as to the truth of his publication." *St. Amant v. Thompson*, 88 S.Ct. 1323, 1325 (1968) (emphasis added).[20] In this case, there is no such evidence. As there is no

---

[19]Under the *New York Times* standard, a statement has been made with "actual malice" if it was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 84 S.Ct. 710, 726 (1964).

[20]*See also, e.g., Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989) (quoting with approval the above passage from *St. Amant*); *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 561 (5th Cir. 1997) (same). The federal, rather than state, summary judgment procedure and standard applies to the Texas law

24

evidence of malice, Morris's libel claim fails under both section 1681h(e) and the conditional privilege under Texas law.[21]

## Conclusion

For the foregoing reasons, we REVERSE the summary judgment on the FCRA claim, AFFIRM the summary judgment on the libel claim, and REMAND the case for further proceedings not inconsistent herewith on the FCRA claim.

REVERSED in part, AFFIRMED in part, and REMANDED.

---

defamation claim. *See Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312-15 (5th Cir. 1995).

[21]If Equifax were to prevail on its argument that it is not a consumer reporting agency, it would likely lose the protection of § 1681h(e). Nonetheless, Morris's libel claim still fails in this case because Equifax enjoys Texas's conditional privilege.